**UNITED STATES of America**

v.

**Maria CORDOBA–HINCAPIE,**
**Defendant.**

**UNITED STATES of America**

v.

**Libardo BUELVAS–CASTRO, Defendant.**

Nos. CR 92–650, CR 92–1366.

United States District Court,
E.D. New York.

July 7, 1993.

486

Zachary W. Carter, U.S. Atty., Brooklyn, NY by Alan Vickery (Cordoba–Hincapie), Margaret Giordano (Buelvas–Castro), for U.S.

Marcia Levy, Legal Aid Society, Brooklyn, NY, for Cordoba–Hincapie.

Douglas Morris, Legal Aid Society, Brooklyn, NY, for Buelvas–Castro.

WEINSTEIN, Senior District Judge.

TABLE OF CONTENTS

I. FACTS ......................................................... 488
   A. Cordoba–Hincapie ........................................ 488
   B. Buelvas–Castro ......................................... 489

II. LAW .......................................................... 489
   A. The Mens Rea Principle ................................. 489
      1. Origins ............................................ 489
      2. Modern View ....................................... 492
         a. Theory ........................................ 492
         b. Exceptions ................................... 495
            i. Public–Welfare Offenses ................ 496
            ii. Other Forms of Strict Liability ....... 497
            iii. Negligence ........................... 500
         c. Model Penal Code ............................. 501
         d. Current Trends ............................... 504
      3. Constitutional Dimension ........................... 505
         a. Supreme Court Treatment ...................... 505
            i. Strict Liability ....................... 506
            ii. Mens Rea Generally .................... 509
            iii. Other Cases .......................... 513
                (a) First Amendment ................ 513
                (b) Void-for-Vagueness ............. 513
                (c) Actus Reus ..................... 513
         b. Due Process Analysis ......................... 515
      4. Lower Federal Courts ............................... 518
   B. Sentencing Context ..................................... 521
      1. General Principles ................................. 521
      2. Effect of Guidelines .............................. 522
   C. Mistake in Narcotics Cases ............................. 527
      1. Applicable Law .................................... 527
         a. Statutes ...................................... 527
         b. Guidelines ................................... 529
         c. Second Circuit Cases ......................... 530
      2. Burden-of-Proof Structure ......................... 531
      3. Justifications .................................... 532

III. APPLICATION OF LAW TO FACTS ................................ 534

IV. CONCLUSION ................................................. 534

---

These cases present two profound and fundamental questions about the operation of the criminal law in a democratic constitutional society. Can the requirement of proof of *mens rea* as a basis for criminals' punishment be circumvented by manipulation of a sentencing system? Can the guarantees of a jury trial to determine the substantive predicates of criminality be shortcircuited by characterizing a critical element of great significance in deciding punishment as one for the judge to determine in fixing sentence—a sentence predetermined under fixed guidelines,

not one imposed under a discretionary regime?

To impose the sentences demanded by the prosecution under the United States Sentencing Guidelines (Guidelines) would require that both these questions be answered affirmatively. To do so in the context of the instant cases would be to strike a blow at constitutional protections that developed in England and this country over almost a millenium. Congress could not have intended such a bizarre and dangerous result when it adopted guideline sentences. The war on

drugs does not require that we win a minor battle with two drug mules by denigrating what we seek to protect—constitutional rights and privileges.

Defendants imported heroin into the United States believing it to be cocaine. The punishment under the Guidelines for smuggling heroin is greater than for bringing in cocaine. The issue presented is how to treat their mistakes of fact: should they be punished only for the crimes they believed they were committing?

The unique new context of guideline sentencing and the serious drift of the federal criminal law away from first principles require that this problem be treated at some length. A rational and principled system of criminal sanction cannot tolerate the addition of many months of imprisonment to these defendants' sentences simply because it may be inconvenient to draw distinctions based upon traditional notions of *mens rea*. Congress did not require such a result and the Constitution does not countenance it. Consistent with the fundamental Anglo–American tradition that blameworthiness hinges upon a culpable state of mind, defendants' punishments must be limited by their culpability.

## I. FACTS

### A. *Cordoba–Hincapie*

Defendant Maria Theresa Cordoba–Hincapie is 38 years old and a Colombian citizen. On May 4, 1992 she arrived at Kennedy Airport on a flight from Colombia. During the United States Customs inspection that followed her arrival, an x-ray examination revealed balloons in her digestive tract. The balloons contained 772.8 grams of heroin.

Ms. Cordoba–Hincapie was born in Columbia and raised there, with her seven siblings. Her mother washed clothes to support the family. Defendant never married and now has three daughters, ranging in age from nine to eighteen. The children's father has not been in contact with the family since 1990. They have no means to support themselves. Defendant has had five years of education. She has found occasional work in Colombia as a seamstress and at other menial tasks. She came to the United States in hopes of obtaining an operation to cure the loss of hearing in an ear. She planned to use the proceeds of her crime to pay for the operation and to support her family upon her return to Colombia. The government does not contest her account.

She was charged with knowingly and intentionally importing heroin into the United States in violation of 21 U.S.C. §§ 952(a) and 960(b)(1)(A). Section 960(b)(1)(A) requires a sentence of at least ten years of imprisonment for importation of in excess of one kilogram of heroin. On July 9, 1992, she pled guilty, pursuant to an agreement with the government that is now common in this district, to the lesser penalty provision of § 960(b)(2)(A) which carries a minimum sentence of five years imprisonment for 100 grams or more of heroin. That agreement provided that, should the laboratory report reveal the net weight of the heroin to be less than one kilogram, the indictment and plea would be amended at the government's request to charge a violation of § 960(b)(3), which carries no mandatory minimum term of incarceration. The drugs did turn out to weigh less than a kilogram and thus no statutory minimum applied to her sentence.

The government, by allowing a plea predicated on less than 100 grams of heroin, was able to avoid the harsh required minimum sentences of our drug laws. *See United States v. McClean*, 822 F.Supp. 961, 1993 WL 189290 (E.D.N.Y.1993). It did not—or so the government argues—avoid the strictures of the Guidelines which require the "real offense" to control the sentence. If she was smuggling heroin, the Guideline range would be 46 to 57 months. For cocaine, it would be 30 to 37 months.

A *Fatico* hearing was held at which defendant testified and was cross-examined about the events leading up to her crime. She stated, as she did at her plea allocution, that she was told by the person for whom she acted as courier that the opaque balloons he provided contained cocaine. She testified that she believed him, made no further inquiry, swallowed the balloons and departed from Colombia thinking that she was carrying cocaine. She swore that she was not aware of

heroin smuggling from Colombia, had not previously imported drugs and did not know other smugglers. Defendant also submitted a newspaper article describing her case and discussing the relatively novel phenomenon of Colombian production and export of heroin. *See* Scott Ladd, *Heroin Haulers,* Newsday, May 26, 1992, at 3.

Her testimony was credible. Based upon her education, her experience, the facts surrounding her involvement in this crime, the physical resemblance between cocaine and heroin and the long predominance of cocaine in Colombia, the court finds beyond a reasonable doubt that she believed she was importing cocaine.

### B. *Buelvas–Castro*

Defendant Libardo Buelvas–Castro is 37 and a Colombian citizen. He arrived at Kennedy Airport on a flight from Colombia on December 11, 1992. An x-ray examination during a Customs inspection revealed foreign bodies in his digestive tract. The balloons contained 686.7 grams of heroin.

Defendant was born in Colombia and raised in an intact family. He married in 1976 and now has four children between the ages of nine and fourteen. He has been employed as a butcher since 1977. He has had five years of school.

He was charged with knowingly and intentionally importing heroin into the United States in violation of 21 U.S.C. §§ 952(a) and 960(b)(2)(A). Section 960(b)(2)(A) mandates a prison term of at least five years for importation of in excess of 500 grams of heroin. Pursuant to an agreement like Cordoba–Hincapie's, he was permitted to plead guilty to one count of importing heroin into the United States in violation of 21 U.S.C. §§ 952(a) and 960(b)(3). Section 960(b)(3) carries no mandatory minimum sentence. For smuggling heroin, the Guideline range is 37 to 46 months. For cocaine it is 30 to 37 months.

At his plea allocution on March 23, 1993, defendant swore that he was told by the person for whom he acted as courier that he would be carrying 600 grams of cocaine. He said he was given prepared packages to swallow in Colombia and told that he would be met at Kennedy Airport.

Defendant testified at a *Fatico* sentencing hearing that his Colombian handler told him he was swallowing cocaine. He swore that he believed the representation because he was not familiar with drugs and that he did not ask any questions. He stated that he is from the coastal region of Colombia, that heroin is not produced there, that he does not read newspapers and that he did not learn that heroin is produced in Colombia until after he came to the United States.

The government contended that heroin is now the predominant drug for export from Colombia. It was afforded the opportunity to adjourn the hearing and produce evidence in support of this contention. It declined to do so.

Based upon defendant's background and education, the circumstances surrounding his involvement in this crime, the physical resemblance between heroin and cocaine and the long predominance of cocaine in Colombia, the court finds beyond a reasonable doubt that he believed he was importing cocaine.

## II. LAW

### A. *The Mens Rea Principle*

The term, *"mens rea,"* meaning "a guilty mind; a guilty or wrongful purpose; a criminal intent," *Black's Law Dictionary* 1137 (4th ed. 1968), is shorthand for a broad network of concepts encompassing much of the relationship between the individual and the criminal law. *See* Sanford H. Kadish & Stephen J. Schulhofer, *Criminal Law and its Processes* 217 (1989) ("A common usage is to express all ... qualifications to liability in terms of the requirement of mens rea."). These doctrines of criminal responsibility and the theories that support them are deeply rooted in our legal tradition as one of our first principles of law. To understand its import, it is necessary to unpeel the terse Latin.

#### 1. Origins

Western civilized nations have long looked to the wrongdoer's mind to determine both the propriety and the grading of punishment.

See, e.g., *Morissette v. United States*, 342 U.S. 246, 250 n. 4, 72 S.Ct. 240, 243 n. 4, 96 L.Ed. 288 (1952) ("For a brief history and philosophy of this concept in Biblical, Greek, Roman, Continental and Anglo–American law, see Radin, Intent, Criminal, 8 Encyc. Soc. Sci. 126."). "For hundreds of years the books have repeated with unbroken cadence that *Actus non facit reum nisi mens sit rea.*" Francis Bowes Sayre, *Mens Rea*, 45 Harv. L.Rev. 974, 974 (1932) [hereinafter Sayre, *Mens Rea* ]; *see also Black's Law Dictionary* 55 (4th ed. 1968) (defining the *actus non* rule: "An act does not make [the doer of it] guilty, unless the mind be guilty; that is, unless the intent be criminal."). This is the criminal law's mantra.

In his dialogues in *Laws*, Plato attempts to construct an ideal criminal code. He rejects the then-prevailing distinction between voluntary and involuntary acts in favor of gradation of crimes based upon levels of intent. A.E. Taylor, *Introduction, in The Laws of Plato* xlix–1 (A.E. Taylor trans., 1934). Plato's "Visitor from Athens" explains:

> What the legislator has to ask himself is whether the agent of the beneficial or detrimental act is acting with a rightful spirit and in a rightful manner.... [H]e must aim throughout his legislation at reconciling the minds of the authors and sufferers of the various forms of detriment by award of compensation, and converting their difference into friendship.... And then as to *wrongful* detriment—or gain, either, in the case that a man should cause another to profit by a wrongful act—such things, as we know, are maladies of the soul, and we must cure them whenever they are curable.... And so, if we can but bring a man to this—to hatred of iniquity, and love of right or even acquiescence in right—by acts we do or words we utter, through pleasure or through pain, through honour bestowed or disgrace inflicted, in a word, whatever the means we take, thus and only thus is the work of a perfect law effected.

*Id.* at 250–51 (emphasis in original). Plato then proceeds to lay out a nuanced criminal code that permits defenses based upon insanity, infancy and other forms of incapacity, that punishes premeditated murder more severely than homicide committed in the heat of passion and that absolves those who act unintentionally. *Id.* at 253–73 ("If a man unintentionally cause the death of a person ... he shall, on accomplishing such purifications as may be directed by a law for these cases received from Delphi, be esteemed clear of pollution.").

The ancient English law tended towards strict liability for acts. But-for causation was considered the essential prerequisite to criminal fault. II Frederick Pollock & Frederic William Maitland, *The History of English Law* 470–71 (2d ed. 1968) ("If once it be granted that a man's death was caused by the act of another, then that other is liable, no matter what may have been his intentions or his motives."); *see also* Sayre, *Mens Rea, supra*, at 975–80. The "most primitive laws," according to Pollock and Maitland, held men liable for "acts" done by their slaves, beasts and even their possessions. II Pollock & Maitland, *supra*, at 472–73 ("If his sword kills, he will have great difficulty in swearing that he did nothing whereby the dead man was 'further from life or nearer to death.' "). Pollock and Maitland explain that the early law was hostile to the notion of examining an individual's mental state:

> [I]t is hard for us to acquit the ancient law of that unreasoning instinct that impels the civilised man to kick, or consign to eternal perdition, the chair over which he has stumbled. But law which would not confess to sanctioning this instinct still finds grave difficulties in its way if it endeavors to detect and appreciate the psychical element in guilt and innocence. "The thought of man shall not be tried, for the devil himself knoweth not the thought of man": thus at the end of the middle ages spoke Brian C.J. in words that might well be the motto for the early history of the criminal law.

*Id.* at 474–75. While "up to the twelfth century the conception of *mens rea* in anything like its modern sense was non-existent," Sayre, *Mens Rea, supra*, at 981, it should be remembered that the very nature of most offenses rendered them unlikely or impossible of commission without some level of intent and that state of mind "seems to

have been a material factor, even from the very earliest of times, in determining the extent of punishment." *Id.*

Toward the end of the Middle Ages, the modern focus on the criminal's state of mind gradually began to evolve. "[T]he history of the recognition of culpable states of mind should be viewed as a continuing process of self-civilization." Paul H. Robinson, *A Brief History of Distinctions in Criminal Culpability*, 31 Hastings L.J. 815, 850 (1980) (describing evolution of culpability distinctions from ninth century to present). By the end of the twelfth century, the Roman law, with its concept of *culpa*, and the canon law, with it emphasis on moral guilt, began to influence the development of doctrines of culpability. Sayre, *Mens Rea, supra*, at 982–83. Holdsworth explains,

> As the idea grew up that to constitute a crime there must be some sort of a *mens rea* on the part of the accused, it came to look unjust to accuse a man of theft merely because he happened to be in possession of goods to which another had a better right.

III A.W. Holdsworth, *A History of English Law* 322 (1927). The book of *Leges* of Henry I, which tends toward more primitive concepts of strict liability, recites in connection with the offense of perjury, *"reum non facit nisi mens rea."* Sayre, *Mens Rea, supra*, at 983. It was inevitable that the development of the criminal law, based as it is upon general and evolving societal mores, would track the development of prevailing views about moral wrongdoing. "The early felonies were roughly the external manifestations of the heinous sins of the day." *Id.* at 989. The word "felon" itself is a derivative of a Latin term meaning one who is "full of bitterness or venom" and who is "cruel, fierce, wicked, base." II Pollock & Maitland, *supra*, at 465.

"[T]he requirement of a guilty state of mind (at least for the more serious crimes) had been developed by the time of Coke." Glanville Williams, *Criminal Law: The General Part* 30 (2d ed. 1961). Coke, writing in the seventeenth century, described the crime of treason as follows:

> So as there must be a compassing or imagination, for an act done *per infatunium*, without compassing, intent, or imagination, is not within this act, as it appeareth by the expresse words thereof. *Et actus non facit reum, nisi mens sit rea. . . .* This compassing, intent, or imagination, though secret, is to be tryed by the peers, and to be discovered by circumstances precedent, concomitant, and subsequent, with all endeavour evermore for the safety of the king.

Edward Coke, *Third Institute* 6 (London, W. Clarke & Sons 1817). In discussing larceny and theft, he declared,

> First it must be felonious, *id est, cum anima furandi*, as hath been said. *Actus non facit reum, nisi mens sit rea.* And this intent to steale must be when it cometh to his hands or possessions: for if he hath the possession of it once lawfully, though he hath *animum furandi* afterward, and carrieth it away, it is no larceny. . . .

*Id.* at 107.

Once the "exceedingly vague" concept of moral blameworthiness, Sayre, *Mens Rea, supra*, at 994, was recognized the law embarked upon the long journey of refinement and development of culpability distinctions that continues to this day. *Id.* at 994–1004. Increasing precision in the law of excuses and defenses was partly a cause and partly an effect of the firmness with which the *mens rea* principle came to be held. VIII A.W. Holdsworth, *supra*, at 433. After the twelfth century, defenses such as insanity, infancy or compulsion began to be recognized as negativing guilt. Sayre, *Mens Rea, supra*, at 1004–06. Mistake of fact did not become a well-recognized defense until the seventeenth century. *Id.* at 1014; *see also* VIII A.W. Holdsworth, *supra*, at 434. Holdsworth, in a chapter covering the fourteenth and fifteenth centuries, writes,

> The law has left far behind old rules which look merely at the act and neglect the intent; but it has not therefore swallowed whole the canonist's theory that moral guilt should be chiefly regarded. A formed intent not manifested by any overt act, even a frustrated attempt, will not amount to a felony.

II A.W. Holdsworth, *supra*, at 452.

By the time Blackstone came to write his *Commentaries* in the middle of the eigh-

teenth century, he was able to summarize the English criminal law as follows:

> All the several pleas and excuses which protect the committer of a forbidden act from the punishment which is otherwise annexed thereto, may be reduced to this single consideration, *the want or defect of will.* An involuntary act, as it has no claim to merit, so neither can it induce any guilt: the concurrence of the will, when it has its choice either to do or to avoid the fact in question, being the only thing that renders human action either praiseworthy or culpable. Indeed, to make a complete crime cognizable by human laws, there must be both a will and an act.... [A]s no temporal tribunal can search the heart, or fathom the intentions of the mind, otherwise then as they are demonstrated by outward actions, it therefore cannot punish for what it cannot know.... And, as a vicious will without a vicious act is no civil crime, so, on the other hand, an unwarrantable act without a vicious will is no crime at all. So that to constitute a crime against human laws, there must be, first, a vicious will; and, secondly, an unlawful act consequent upon such vicious will.

II William Blackstone, *Commentaries on the Laws of England* *20–21 (emphasis in original).

### 2. Modern View

#### a. Theory

Two general statements can be made with some confidence about the status of *mens rea* in the modern criminal law. First, "when it comes to attaching a precise meaning to *mens rea,* courts and writers are in hopeless disagreement." Sayre, *Mens Rea, supra,* at 974; *see also* Leo Katz, *Bad Acts and Guilty Minds* 165–209 (1987) (exploring, through hypotheticals, the complexity of the *mens rea* principle); Gary V. Dubin, Mens Rea *Reconsidered: A Plea for a Due Process Concept of Criminal Responsibility,* 18 Stan.L.Rev. 322, 325 (1966) ("[I]n sharp contrast to its nearly deified legal status, [*mens rea*] has for centuries remained anomalously and bafflingly elusive."). Second, *mens rea* in some form remains a defining and irreducible characteristic of the criminal law. Glanville

Williams, one of this century's most astute commentators on the criminal law, put the matter succinctly:

> It may be said that any theory of criminal punishment leads to a requirement of some kind of *mens rea.* The deterrent theory is workable only if the culprit has knowledge of the legal sanction; and if a man does not foresee the consequences of his act he cannot appreciate that punishment lies in store if he does it. The retributive theory presupposes moral guilt; incapacitation supposes social danger; and the reformation aim is out of place if the offender's sense of values is not warped.

Glanville Williams, *Criminal Law: The General Part* 30 (2d ed. 1961); *see also* Herbert L. Packer, *Mens Rea and the Supreme Court,* 1962 Sup.Ct.Rev. 107, 109 (1962) (to punish without reference to the actor's state of mind has no deterrence value and cannot be justified on retributive grounds since the actor is not morally blameworthy). Stephen, in summarizing the development of the English law, captures the relationship between these two general observations:

> The maxim, "Actus non facit reum nisi mens sit rea," is sometimes said to be the fundamental maxim of the whole criminal law; but I think that, like many other Latin sentences supposed to form a part of the Roman law, the maxim not only looks more instructive than it really is, but suggests fallacies which it does not precisely state.... The truth is that the maxim about "mens rea" means no more than that the definition of all or nearly all crimes contains not only an outward and visible element, but a mental element, varying according to the different nature of the different crimes.

Sir James Fitzjames Stephen, *A History of the Criminal Law of England* 94–95 (1883); *see also* Williams, *supra,* at 32–33 (recognizing that *mens rea* requirement has been modified where necessary, permitting liability based upon negligence and even ("a more dubious development") without regard to fault).

A host of other modern authorities have stated the importance of the mental element in crime, though describing and justifying it

variously. Bentham's utilitarian theories portrayed culpability requirements as essential to ensuring the "economy" of punishment. Proportionality and deterrence were, for Bentham, the most essential principles of the criminal law. "Every particle of real punishment that is produced, more than what is necessary for the production of the requisite quantity of apparent punishment," he wrote, "is just so much misery run to waste." Jeremy Bentham, *Principles of Penal Law, in* 1 *The Works of Jeremy Bentham* 398 (John Bowring ed., 1962). In his utilitarian approach to punishment, Bentham sought to promote deterrence. To that end, a rational actor with full knowledge of the relevant facts was required. Punishment will be ineffective and, therefore, wasteful if the violation is of an *ex post facto* law or the actor does not otherwise have notice of the law, if the actor is insane, an infant or intoxicated, or if the actor labors under a mistake of fact or in response to duress or physical compulsion. *Id.* at 397.

Holmes also analyzed the problem of *mens rea* from a utilitarian perspective. For Holmes, though deterrence is the "chief and only purpose of punishment," Oliver Wendell Holmes, *The Common Law* 46 (1881), retribution is also a justifiable goal:

> [I]t may be said, not only that the law does, but that it ought to, make the gratification of revenge an object.... The first requirement of a sound body of law is, that it should correspond with the actual feelings and demands of the community, whether right or wrong. If people would gratify the passion of revenge outside of the law, if the law did not help them, the law has no choice but to satisfy the craving itself, and thus avoid the greater evil of private retribution.

*Id.* at 41–42. Both the deterrent and retributive objectives were justifiable, according to Holmes, because "[n]o society has ever admitted that it could not sacrifice individual welfare to its own existence." *Id.* at 43. As with Bentham, even though there would be no moral objection to punishing the unwitting actor in order to improve society as a whole, some form of culpability is required to ensure the effectiveness of penal sanctions.

"[A] law which punished conduct which would not be blameworthy in the average member of the community would be too severe for that community to bear." *Id.* at 50.

The most salient aspect of Holmes' analysis, however, is his ready admission of negligence as satisfying the *mens rea* principle. According to Holmes, the criminal law, like tort law, should serve to compel individuals to bring their conduct within the parameters of what society deems reasonable. *Id.* The test for culpability should be primarily an "external" one and the *mens rea* requirement is satisfied as long as the actor is aware of circumstances "in which [his or her acts] will probably cause some harm which the law seeks to prevent." *Id.* at 75. Not only must the individual "find out at his peril things which a reasonable and prudent man would have inferred from the things actually known," *id.*, but strict liability is also implicitly permissible on his account since there will be instances in which the individual "must go even further, and, when he knows certain facts, must find out at his peril whether the other facts are present which would make the act criminal." *Id.* In general, strict liability has been limited to civil cases. Modern law has been reluctant to extend the concept to criminal *malum in se* offenses—the category into which drug dealing has been placed, even if only recently, by our society and legislatures.

While recognizing that "legal history shows a continual movement back and forth between extreme solicitude for the general security and extreme solicitude for the individual life," Roscoe Pound described the *mens rea* principle as fundamental:

> [I]t remains true that our legal treatment of delinquents is not preventive but is punitive in its whole conception and administration. Historically, our substantive criminal law is based upon a theory of punishing the vicious will. It postulates a free agent confronted with a choice between doing right and doing wrong and choosing freely to do wrong. It assumes that the social interest in the general security and the social interest in the general morals are to be maintained by imposing upon him a penalty corresponding exactly to the

gravity of his offense. It is enforced by an elaborate machinery of execution of the appointed sentence.

Roscoe Pound, *Introduction, in* Francis Bowes Sayre, *A Selection of Cases on Criminal Law* xxxiv–xxxvii (1927).

The leading modern texts have taught the importance of *mens rea* in the criminal law. *See, e.g.,* Sanford H. Kadish & Stephen J. Schulhofer, *Criminal Law and its Processes* 217–18 (1989); Williams, *supra,* at 30–33. In his classic treatise, Bishop reports, "Prompting the act, there must be an evil intent.... [A]n act and evil intent must combine to constitute a crime." 1 Joel Prentiss Bishop, *Bishop on Criminal Law* §§ 205–06 (9th ed. 1923); *see also* Edwin R. Keedy, *Ignorance and Mistake in the Criminal Law,* 22 Harv. L.Rev. 75, 81 (1908) ("It is a fundamental principle of the criminal law, for which no authorities need be cited, that the doer of a criminal act shall not be punished unless he has a criminal mind."). "Neither in philosophical speculation, nor in religious or moral sentiment," Bishop writes, "would any people in any age allow that a man should be deemed guilty unless his mind was so." 1 Bishop, *supra,* § 287. Bishop counsels vigilance against erosion of this principle:

The calm judgment of mankind keeps this doctrine among its jewels. In times of excitement, when vengeance takes the place of justice, every guard around the innocent is cast down. But with the return of reason comes the consciousness that where the mind is pure, he who differs in act from his neighbors does not offend.

*Id.* § 289.

Jerome Hall, in his treatise, expresses a similar view:

The distinctions concerning intention, recklessness and negligence ... are warranted on ethical grounds. The relevant ethical principle expressed in terms of *mens rea,* that penal liability should be limited to voluntary (intentional or reckless) commission of harms forbidden by penal law, represents not only the perennial view of moral culpability, but also the plain man's morality. It is a necessary principle if punishment is to be distinguished from other sanctions.

Jerome Hall, *General Principles of Criminal Law* 133–34 (2d ed. 1960). The leading current treatise is in accord. *See* 1 Wayne R. LaFave & Austin W. Scott, *Substantive Criminal Law* 270 (1986) (A "basic premise" of the criminal law "is that conduct, to be criminal, must consist of something more than mere action ... some sort of bad state of mind is required as well.").

Perhaps the most important modern work on criminal culpability is H.L.A. Hart's *Punishment and Responsibility* (1968). This is a landmark collection of essays that vigorously defend the *mens rea* principle. Proceeding from the premise that

[i]t is characteristic of our own and all advanced legal systems that the individual's liability to punishment, at any rate for serious crimes carrying severe penalties, is made by law to depend, among other things, on certain mental conditions,

*id.* at 28, Hart seeks the philosophical source of the culpability requirement. He rejects Bentham's utilitarian justifications as inadequate. If deterrence were the only objective of the criminal law and sacrifice of the individual were not a concern, strict liability would be permissible since punishment of those "who act unintentionally or in some other normally excusing manner may have a utilitarian value in its effect on others." *Id.* at 20; *see also id.* at 42–43, 179. To the contrary, if strict liability is admitted, Hart says, it is done "with the sense that some other principle has been overridden." *Id.* at 20.

Holmes' theory of "objective liability" also fails in Hart's view. *Id.* at 38. Holmes erroneously poses a choice between a system in which mental conditions are used only to find moral culpability and one in which mental conditions are not considered at all. *Id.* Hart finds no such dilemma. "[T]here are independent reasons, apart from the question of moral guilt, why a legal system should require a voluntary act as a condition of responsibility." *Id.* Hart distinguishes between two "moral" questions. First is the question, for the consideration of the legislature, whether enforcement of a given law produces more good than evil. If good out-

weighs evil, then the law is morally permissible. Second is the question, for consideration at the judicial stage, whether the particular person accused should be excused on account of his or her mental condition because that person "could not have helped" doing the act and, therefore, punishment would be unjust. *Id.* at 39. Hart characterizes this *mens rea* principle as follows:

[T]he need to inquire into the "inner facts" is dictated not by the moral principle that only the doing of an *immoral* act may be legally punished, but by the moral principle that no one should be punished who could not help doing what he did.

*Id.* (emphasis in original).

The *mens rea* principle, for Hart, flows from our society's commitment to individual choice. "[W]e look on excusing conditions as something that protects the individual against the claims of the rest of society." *Id.* at 44. The existence of the panoply of excuses and culpability requirements in the criminal law allows the individual to exercise choice with respect to violation of the law. *Id.* at 44–45. Hart summarizes his analysis as follows:

On this view excusing conditions are accepted as something that may conflict with the social utility of the law's threats; they are regarded as of moral importance because they provide for all individuals alike the satisfactions of a choosing system.... In this way the criminal law respects the claims of the individual as such, or at least as a *choosing being,* and distributes its coercive sanctions in a way that reflects this respect for the individual.

*Id.* at 49 (emphasis in original); *see also* Andrew Ashworth, *Principles of Criminal Law* 128–29 (1991) (contrasting deterrence-based utilitarian theories with "liberal" theories, which "regard respect for the autonomy of each individual citizen as capable of overriding general calculations of social utility").

Henry Hart's thoughtful analysis of the criminal law led him to a destination quite close to H.L.A. Hart's. For Henry Hart, it is not just the *mens rea* principle but the whole of the criminal law that reflects the primacy of individual freedom and the individual's relationship to the community as fundamental organizing principles of our society. He writes,

Man realizes his potentialities most significantly ... by making himself a functioning and participating member of his community, contributing to as well as drawing from it.

What is crucial in this process is the enlargement of each individual's capacity for effectual and responsible decision. For it is only through personal, self-reliant participation, by trial and error, in the problems of existence, both personal and social, that the capacity to participate effectively can grow. Man learns wisdom in choosing by being confronted with choices and by being made aware that he must abide the consequences of his choice....

Seen in this light, the criminal law has an obviously significant and, indeed, a fundamental role to play in the effort to create a good society. For it is the criminal law which defines the minimum conditions of man's responsibility to his fellows and holds him to that responsibility.

Henry M. Hart, Jr., *The Aims of the Criminal Law,* 23 Law & Contemp. Probs. 401, 410 (1958).

The conclusion that *mens rea* has a primacy in modern criminal law was central to the magisterial analysis of Professors Jerome Michael and Herbert Wechsler in their two-part work *A Rationale of the Law of Homicide,* 37 Colum.L.Rev. 701, 1261 (1937). This work and those already referred to were foundational in the approach taken by the American Law Institute's Model Penal Code (Official Draft and Rev. Comm.1985) (the Code), for which Professor Wechsler was reporter. The Code was the basis of extensive state modifications of criminal laws. *See* Part II A 2 c, *infra.*

### b. Exceptions

As the work of these leading authorities illustrates, the *mens rea* principle remains, in the modern criminal law, a fundamental requirement. Whatever the current application of the *mens rea* history, this brief recapitulation establishes a critical constitutional baseline. By the time the right to a jury trial and due process was embedded in the

first amendments to the Constitution, *mens rea* constituted a fundamental protection against abuse of criminal sanctions by the state. It is a general rule of law that guards beliefs deeply held within our traditions of individual freedom, responsibility and duty. Like most ancient doctrines, however, it has grown far more sophisticated and nuanced than it once was. It can no longer simply be invoked. Its application must be carefully explained and its many distinctions must be considered. Not only has the law developed an appreciation of gradations in mental states, but it now also openly recognizes limited exceptions to a rule once characterized as admitting no compromise.

### i. Public–Welfare Offenses

Perhaps the most common exception to the *mens rea* principle has been in cases involving what are characterized as "public-welfare offenses." Criminal liability has been permitted to attach without regard to fault in instances in which the actor's conduct involves

> minor violations of the liquor laws, the pure food laws, the anti-narcotics laws, motor vehicle and traffic regulations, sanitary, building and factory laws and the like.

Francis Bowes Sayre, *Public Welfare Offenses*, 33 Colum.L.Rev. 55, 78 (1933) [hereinafter Sayre, *Public Welfare* ]; *see generally* American Law Institute, *Model Penal Code* § 2.05 Comment at 284–90. & n. 7 (Official Draft and Rev.Comm.1985) (collecting cases, from nineteenth century through mid–1970s).

Sayre dated the development of this welfare-exception doctrine to the middle of the nineteenth century. Emphasizing that he was speaking of "light" offenses, he explained it as follows:

> The decisions permitting convictions of light police offenses without proof of a guilty mind came just at the time when the demands of an increasingly complex social order required additional regulation of an administrative character unrelated to questions of personal guilt; the movement also synchronized with the trend of the day away from nineteenth century individualism toward a new sense of the importance of collective interests.

Sayre, *Public Welfare, supra*, at 67; *see also Morissette v. United States*, 342 U.S. 246, 253–60, 72 S.Ct. 240, 244–48, 96 L.Ed. 288 (1952) (describing "a century-old but accelerating tendency, discernible both here and in England, to call into existence new duties and crimes which disregard any ingredient of intent" and attributing trend in part to the industrial revolution); *R. v. Woodrow*, 15 M. & W. 404 (Exch. 1846) (conviction for selling adulterated tobacco upheld under statute silent as to *mens rea* requirement); *R. v. Dixon*, 3 M. & S. 12 (K.B. 1814) (conviction for selling adulterated bread upheld under statute silent as to *mens rea* requirement). Sayre cautioned against overstating the significance of this development. "Criminality is and always will be based upon a requisite state of mind as one of its prime factors." Sayre, *Public Welfare, supra*, at 56.

Sayre was able to discern from the cases two principles identifying the contours of the public-welfare offense doctrine. *Id.* at 72. First, if punishment of the wrongdoer far outweighs regulation of the social order as a purpose of the law in question, then *mens rea* is probably required. *Id.* Second, if the penalty is light, involving a relatively small fine and not including imprisonment, then *mens rea* probably is not required. *Id.; see also* Herbert L. Packer, *Mens Rea and the Supreme Court*, 1962 Sup.Ct.Rev. 107, 148–51 (1962) (arguing that public-welfare offense doctrine should not include crimes permitting imprisonment since the "stigma and loss of liberty involved in a conditional or absolute sentence of imprisonment sets that sanction apart from anything else the law imposes"); 1 Wayne R. LaFave & Austin W. Scott, *Substantive Criminal Law* 342–44 (1986) (if punishment is severe, strict liability is unlikely to have been intended by legislature).

Justice Jackson once described the public-welfare offenses as, for practical purposes, imposing a negligence standard:

> The accused, if he does not will the violation, usually is in a position to prevent it with no more care than society might reasonably expect and no more exertion than it might reasonably exact from one who assumed his responsibilities. Also, penal-

ties commonly are relatively small, and conviction does no grave damage to an offender's reputation.

*Morissette*, 342 U.S. at 256, 72 S.Ct. at 246.

Other commentators have described and delimited this doctrine of strict liability on similar grounds. *See, e.g.*, 1 Joel Prentiss Bishop, *Bishop on Criminal Law* § 206a (9th ed. 1923) (recognizing but minimizing limited exception to *mens rea* principle for public-welfare offenses); H.L.A. Hart, *Punishment and Responsibility* 32 (1968) (Public-welfare offenses "are usually punishable with a fine and are sometimes said by jurists who object to strict liability not to be criminal in any 'real' sense."); 1 Wayne R. LaFave & Austin W. Scott, *Substantive Criminal Law* 340–41 (1986) ("Usually, but not always, the statutory crime-without-fault carries a relatively light penalty—generally of the misdemeanor variety."); Glanville Williams, *Criminal Law: The General Part* 235 (2d ed. 1961) (Public-welfare offenses "presuppose a continuous activity, such as carrying on a business, so that (a) special skill and attention may reasonably be demanded, and (b) if the law is broken there will be a suspicion that it was a deliberate breach due to self-interest."); Anthony A. Cuomo, *Mens Rea and Status Criminality*, 40 S.Cal.L.Rev. 463, 521–22 (Public-welfare offenses are not crimes but rather are "regulatory measures" because of their light penalties and lack of stigma.).

Given this modern development, anti-drug offenses might once have been characterized as public-welfare offenses, particularly as this country moved from a "freedom to use" model through some tax and medical models beginning in the 1910s. When, however, criminal penalties were markedly increased, particularly through such severe sentencing mechanisms as the Rockefeller laws in New York and those adopted in our current war on drugs that now include life sentences, *see* 21 U.S.C. § 960(b)(3) (maximum term of life imprisonment for narcotics importation in which death or serious injury results), and even capital punishment, *see* 21 U.S.C. § 848(e) (possible sentence of death for drug offenses in which killing results), the legal-constitutional situation changed radically. What once may have been a minor welfare offense, *malum prohibitum*, is now a major criminal offense, *malum in se*. Older cases that may have allowed conviction of narcotics offenses without proof of *mens rea* have no precedential value in this new setting.

ii.  Other Forms of Strict Liability

Strict liability has been permitted in the criminal law in a number of other instances. *See, e.g.*, Henry M. Hart, Jr., *The Aims of the Criminal Law*, 23 Law & Contemp. Probs. 401, 430 (1958) (statutory rape and bigamy); Anthony A. Cuomo, Mens Rea *and* Status Criminality, 40 S.Cal.L.Rev. 463, 517 (1967) (bigamy, statutory rape, misdemeanor-manslaughter and felony-murder); Herbert L. Packer, *Mens Rea and the Supreme Court*, 1962 Sup.Ct.Rev. 107, 141–42 (1962) (statutory rape, felony-murder and misdemeanor-manslaughter). The most widely recognized form of strict liability outside the realm of public-welfare offenses probably is the doctrine, embodied in statute and upheld by courts in a majority of states, that the perpetrator of the crime of "statutory rape," that is, intercourse with a person below the age at which the law deems consent possible, cannot defend on the grounds that he did not know of or was mistaken as to the victim's age. *See, e.g., State v. Stiffler*, 117 Idaho 405, 788 P.2d 220 (Sup.Ct.1990); *Commonwealth v. Knap*, 412 Mass. 712, 592 N.E.2d 747 (Sup.Ct.1992); *People v. Cash*, 419 Mich. 230, 351 N.W.2d 822 (Sup.Ct.1984); *see also* Matthew T. Fricker & Kelly Gilchrist, Comment, United States v. Nofziger *and the Revision of 18 U.S.C. § 207*, 65 Notre Dame L.Rev. 803, 813–16 & nn. 55–61 (1990) (history and development of statutory rape as strict liability offense).

In defense of *mens rea* principles, a growing number of states have developed legislative or judge-made defenses applicable in statutory rape cases, usually requiring the defendant to prove a "reasonable" mistake of fact as to the victim's age. *See, e.g., State v. Guest*, 583 P.2d 836 (Alaska Sup.Ct.1978) (judge-made defense of reasonable mistake as to age, in part on ground that statutory rape "may not appropriately be categorized as a public welfare offense"); *Perez v. State*, 111 N.M. 160, 803 P.2d 249 (Sup.Ct.1990) (though strict liability is required to protect

children under the age of thirteen, reasonable mistake-of-fact defense permitted, by judicial decision, if victim is between 13 and 16); *State v. Elton,* 680 P.2d 727 (Utah Sup. Ct.1984) (in view of statutory provisions providing for mistake-of-fact defense and requiring *mens rea* for all crimes not deemed strict liability offenses by the legislature, government must prove defendant was aware of or was negligent as to the age of the victim and affirmative defense of mistake of fact must be permitted); *State v. Dodd,* 53 Wash.App. 178, 765 P.2d 1337 (Ct.App.1989) (statutory defense of reasonable mistake as to age); *see also* American Law Institute, *Model Penal Code* § 213.6(1) (Official Draft and Rev. Comm.1985) (reasonable mistake as to age is defense if child is ten or older). The California Supreme Court prepared the ground on which these exculpatory doctrines have flourished in *People v. Hernandez,* 61 Cal.2d 529, 39 Cal.Rptr. 361, 393 P.2d 673 (Sup.Ct.1964) (ruling that reasonable mistake that victim is eighteen or more years old is defense to charge of statutory rape, on ground that intent requirement for serious crimes must be presumed in absence of legislative statement to contrary). *But see People v. Olsen,* 36 Cal.3d 638, 205 Cal.Rptr. 492, 685 P.2d 52 (Sup.Ct.1984) (refusing to permit defense, despite silence of statute, of reasonable mistake as to age to charge of lewd and lascivious conduct with child under age of fourteen in view of "strong public policy considerations" favoring protection of children under fourteen).

The narrow "statutory rape exception" to the *mens rea* principle was debated, under a somewhat different and archaic law, in the famous English case of *R. v. Prince,* L.R. 2 Cr.Cas.Res. 154 (1875), *reprinted in* [1874–80] All E.R.Rep. 881. The defendant was convicted under a statute prohibiting the "unlawful" taking of an unmarried girl under the age of 16 out of the possession of her father. Prince complained of the absence of a requirement of knowledge as to the girl's age. The court upheld his conviction. One group of judges argued that, leaving aside the question of age, the act alone was not "illegal" but was "wrong in itself" and, therefore, the legislature had determined that the act "should be at the risk of the taker." *Id.*

at 883–85 (Bramwell, B.). They insisted that the *mens rea* principle was preserved by requiring that the defendant know that he lacked the father's consent. The lone dissenter took the others to task for what he conceived to be abandonment of the *mens rea* principle. *Id.* at 887–95 (Brett, J.). He argued that there would have been no criminal offense had the facts been as defendant believed them to be and, therefore, the conviction could not stand. The maxim that "there can be no conviction for crime in England in the absence of a criminal mind or mens rea" required that a mistake-of-fact defense be recognized where, if the facts were as the defendant believed them to be, there would have been no crime at all. *Id.* at 895 (Brett, J.).

The *Prince* case, viewed by criminal-law commentators as a landmark in the development of strict liability, was strongly protested by them. *See, e.g.,* Glanville Williams, *Criminal Law: The General Part* 239–41 (2d ed. 1961) (to support Prince's conviction, one must believe that he would have committed "a moral wrong" had facts been as he believed them to be); *see also* Rupert Cross, *Centenary Reflections on Prince's Case,* 91 Law Q.Rev. 540 (1975) (critiquing the several opinions in *Prince* ). Several state courts that have declined to recognize mistake-of-fact defenses in statutory rape cases have done so over vigorous dissents. *See, e.g., People v. Olsen,* 36 Cal.3d 638, 205 Cal.Rptr. 492, 685 P.2d 52, 59–61 (Sup.Ct.1984) (Grodin, J., concurring and dissenting) (conviction should not be permitted in the absence of fault except in narrow class of public-welfare offenses carrying light penalties and little stigma); *State v. Stiffler,* 117 Idaho 405, 788 P.2d 220, 227–29 (Sup.Ct.1990) (Blistine, J., dissenting) ("Refusal to recognize a mistake of age defense to statutory rape ... continues an archaic practice which is no longer in step with modern values or practical reality."); *People v. Cash,* 419 Mich. 230, 351 N.W.2d 822, 830–31 (Sup.Ct.1984) (Kavanagh, J., dissenting) (obviation of proof of *mens rea* in felony case is unprecedented). In *State v. Guest,* 583 P.2d 836 (Alaska Sup. Ct.1978), the Alaska Supreme Court viewed expansion of strict liability as a threat to the

principle "that consciousness of wrongdoing is an essential element of penal liability," *id.* at 837, and refused to permit more than the "narrow class" of public welfare regulations

> caused primarily by the industrial revolution, out of which grew the necessity of imposing more stringent duties on those connected with particular industries, trades, properties, or activities that affect public health, safety or welfare.

*Id.* (quoting *Speidel v. State,* 460 P.2d 77, 78 (Alaska Sup.Ct.1969)).

While commentators generally have accepted the doctrine of public-welfare offenses on the ground that it covers only a limited class of cases involving minimal or light punishments, they have not looked kindly upon the creation of further categories of strict liability crimes. *See, e.g.,* Glanville Williams, *Criminal Law: The General Part* 241 (2d ed. 1961) ("Absolute criminal responsibility hits those who, even if they knew the law, would not be deterred."); Henry M. Hart, Jr., *The Aims of the Criminal Law,* 23 Law & Contemp. Probs. 401, 422–23, 430 (1958) ("It is submitted that there can be no moral justification for [strict liability], and that there is not, indeed, even a rational, amoral justification."); Herbert L. Packer, *Mens Rea and the Supreme Court,* 1962 Sup.Ct.Rev. 107, 150–51 (1962) ("No one should be sentenced to imprisonment or its equivalent without being afforded the opportunity to litigate the issue of *mens rea* ...."); Sayre, *Public Welfare, supra,* at 79 (danger exists that courts, following false analogy to public welfare offenses, will extend strict liability to cover unpopular crimes in order to secure easy convictions); *see also* American Law Institute, *Model Penal Code* § 213.1 Comment at 326 (Official Draft and Rev. Comm.1985) (denial of defense in statutory rape cases based on mistake as to age "has excited the ire of commentators and the attention of penal law reformers").

The denial of a mistake-of-law defense in some modern contexts has similarly been criticized as a form of strict liability. *See* Henry M. Hart, Jr., *supra,* at 413–14, 419 (1958) (The principle that ignorance of the law is no excuse "has been ... much misunderstood and abused in relation to regulatory crimes, involving conduct which is not intrinsically wrongful."); Bruce R. Grace, Note, *Ignorance of the Law as an Excuse,* 86 Colum.L.Rev. 1392, 1395–96 (1986) (in era of complex regulatory schemes, presumption that everyone knows the law threatens to violate *mens rea* principle).

Imposition of strict liability has been justified on the grounds that, in certain instances, the prosecution otherwise would have difficulty proving the requisite mental state. *See* 1 Wayne R. LaFave & Austin W. Scott, *Substantive Criminal Law* 341 (1986); *see also* Sayre, *Public Welfare, supra,* at 74 (mistake-of-fact defense refused in statutory rape cases as means of ensuring "real protection" of young victims). H.L.A. Hart rejects this argument, stating,

> At present we have in strict liability clear exceptions to the principle [of responsibility], but no very persuasive evidence that the sacrifice of principle is warranted here by the amount of dishonest evasion of conviction which would ensue if liability were not strict.

H.L.A. Hart, *Punishment and Responsibility* 183 (1968). And, as one observer has explained, while heightened caution on the part of the individual actor can be achieved through a negligence standard, strict liability unnecessarily "establishes a standard which can only breed frustration and disrespect for the law ... [by] impos[ing] criminal sanctions irrespective of care." Anthony A. Cuomo, Mens Rea *and Status Criminality,* 40 S.Cal.L.Rev. 463, 518–19 (1967).

It is important to note a critical distinction between *mens rea* exceptions such as those in statutory rape cases and such as the one we face in the instant cases. In the statutory rape cases without a *mens rea* exception there could be no conviction. In cases distinguishing between knowledge of heroin and cocaine, the belief that cocaine rather than heroin was involved still leads to a most serious conviction. Moreover, the grading involved reflects a public policy making heroin the more serious crime. In effect, the punishment scheme tells potential drug dealers, "If the law cannot deter you from dealing in drugs, it seeks to induce you to at least eschew the more dangerous—heroin; to in-

duce the less dangerous conduct we will provide a reduced penalty."

### iii. Negligence

Somewhere between absolute loyalty to the *mens rea* principle and strict liability lies culpability founded upon some form of negligence. As Herbert Packer has explained, negligence does not represent an abandonment of the *mens rea* principle but rather its extension to include blame for the *absence* of a state of mind that, according to societal norms, the actor should have had. Herbert L. Packer, *Mens Rea and the Supreme Court*, 1962 Sup.Ct.Rev. 107, 143–45 (1962); *cf.* Anthony A. Cuomo, Mens Rea *and Status Criminality*, 40 S.Cal.L.Rev. 463, 516 (1967) (negligence-based offenses are "non-*mens rea* offenses" but are not like public welfare and other strict liability crimes because the very issue to be decided is "whether, in fact, *mens rea* is lacking"). Most commentators have been accepting, even if not enthusiastic, about the role of negligence in the criminal law. Glanville Williams writes, "There is a half-way house between *mens rea* and strict responsibility which has not yet been properly utilized, and that is responsibility for negligence." Glanville Williams, *Criminal Law: The General Part* 262 (2d ed. 1961); *see also* 1 Wayne R. LaFave & Austin W. Scott, *Substantive Criminal Law* 325–33 (1986) (describing widespread use of negligence in criminal law). Packer is in accord:

> [T]he idea of criminal responsibility based upon the actor's failure to act as carefully as he should affords an important and largely unutilized means for avoiding the tyranny of strict liability in the criminal law.

*Packer, supra,* at 110.

H.L.A. Hart provides a typically thoughtful justification for the criminal law being more willing to accept liability based upon negligence than liability without fault:

> [I]t does not appear unduly harsh, or a sign of archaic or unenlightened conceptions of responsibility, to include gross, unthinking carelessness among the things for which we blame and punish.... There seems a world of difference between punishing people for the harm they unintentionally but carelessly cause, and punishing

them for the harm which no exercise of reasonable care on their part could have avoided.... So "I just didn't think" is not in ordinary life, in ordinary circumstances, an excuse; nonetheless it has its place in the rough assessments which we make, outside the law, of the gravity of different offenses which cause the same harm.... Hence, showing that the damage was not intentional, but the upshot of thoughtlessness or carelessness, has its relevance as a mitigating factor affecting the quantum of blame or punishment.

H.L.A. Hart, *Punishment and Responsibility* 136 (1968).

Henry Hart's analysis is even more probing. He readily embraces liability based upon recklessness: "If an individual knowingly takes a risk of a kind which the community condemns as plainly unjustifiable, then he is morally blameworthy and can properly be adjudged a criminal." Henry M. Hart, Jr., *The Aims of the Criminal Law*, 23 Law & Contemp. Probs. 401, 416 (1958). The justification for this view is that the reckless actor knows of his or her own deficiencies. For example, the doctor who swathes a patient with kerosene-soaked rags may not know of the effect of kerosene on the skin, but surely knows that he or she lacks the necessary specialized training to treat the patient safely. *Id.* Hart is more cautious, however, when it comes to pure negligence:

> The question remains whether simple unawareness of risk, without awareness of any deficiency preventing appreciation or avoidance of it and without any element of knowing disregard of a relevant legislative decision, can justly be declared to be culpable. The answer would seem clearly to be no, at least in those situations in which the actor lacks the ability either to refrain from the conduct which creates the risk or to correct the deficiency which makes engaging in the conduct dangerous.... But suppose the actor has this ability? Guilt would, then, seem to depend upon whether he has been put upon notice of his duty to use his ability to a degree which makes his unawareness of the duty, in the under-

standing of the community, genuinely blameworthy.

*Id.* at 415–17.

Hart's explanation of the proper role for negligence in the modern criminal law seems most consonant with traditional *mens rea* doctrine. The law must distinguish between instances in which the negligent actor rightfully can be blamed for having failed to exercise capacities he or she knowingly possessed and those in which the negligent actor lacked the capacity to compensate for the deficiency in question. This criminal negligence standard is tempered by substantially greater subjective considerations than the standard applied in civil actions. Such a cautious approach is justified since the risk of erroneous outcomes in criminal cases, in which liberty usually is at stake, should be minimized. *See In re Winship,* 397 U.S. 358, 368–76, 90 S.Ct. 1068, 1074–79, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring) (justifying burden of proof beyond a reasonable doubt on similar grounds). The writing in this field leaves the impression that acceptance of a negligence standard for criminal punishment is a sad retreat from sounder criminal law doctrine, designed by the commentators to defend the citadel of *mens rea* from breach by strict liability in serious crimes, something none of them accepts.

### c. Model Penal Code

A tour of virtually any aspect of modern criminal law doctrine inevitably includes the Model Penal Code. *See* American Law Institute, *Model Penal Code* (Official Draft and Rev. Comm.1985). No single body of work has had a greater influence on the American criminal law as it now stands. *See generally* Symposium, *The 25th Anniversary of the Model Penal Code,* 19 Rutgers L.J. 519 (1988); *see also* Norman Silber & Geoffrey Miller, *Toward Neutral Principles in the Law: Selections from the Oral History of Herbert Wechsler,* 93 Colum.L.Rev. 854, 917–20 (1993) (discussion with Professor Herbert Wechsler, reporter on the Code, about his role and the influence of the project). The Code represents a unique blend of sophisticated theory and careful, practical drafting. The success of its scheme remains a reminder of the importance of a unified, coherent approach to the application of criminal statutes and the dangers in patchwork criminal codes and decisions that lack internal consistency and leave basic questions and problems unaddressed.

The Code's treatment of *mens rea* is direct, yet it manages to effectuate the sophisticated modern understanding of the principle while applying it with considerable force. Section 2.02 establishes a general requirement of *mens rea,* captures the modern understanding of gradations of mental states and recognizes that *mens rea* requirements must be considered with respect to each element of an offense:

> Except as provided in Section 2.05, a person is not guilty of an offense unless he acted purposely, knowingly, recklessly or negligently, as the law may require, with respect to each material element of the offense.

*Model Penal Code* § 2.02(1). Subsection 2.02(3) establishes a presumption that these *mens rea* requirements apply to statutes that are silent with respect to required mental states. Subsection 2.02(4) states that a law's culpability requirement is presumed to apply to all of its elements. The drafters explain that § 2.02 "expresses the Code's basic requirement that unless some element of mental culpability is proved with respect to each material element of the offense, no valid criminal conviction may be obtained." *Id.* § 2.02 Comment at 229. A primary purpose in enacting § 2.02 was "to dispel the obscurity with which the culpability requirement is often treated when such concepts as 'general criminal intent,' 'mens rea,' 'presumed intent,' 'malice,' 'wilfulness,' 'scienter,' and the like have been employed." *Id.* § 2.02 Comment at 230.

Section 2.05 includes the Code's sole exception to its insistence upon *mens rea* requirements. It is a narrow one:

> (1) The requirements of culpability prescribed by Sections 2.01 and 2.02 do not apply to:
>
> (a) offenses that constitute violations, unless the requirement involved is included in the definition of the offense or the Court determines that its application is consis-

tent with effective enforcement of the law defining the offense; or

(b) offenses defined by statutes other than the Code, insofar as a legislative purpose to impose absolute liability for such offenses or with respect to any material element thereof plainly appears.

"Violations," as defined by the Code, do not constitute crimes, do not carry the collateral consequences of crimes and may not be punished except by suspended sentence, fine or other civil penalty. *Id.* §§ 1.04(5) and 6.02(4). The drafters characterize § 2.05 as "a frontal attack on absolute or strict liability." *Id.* § 2.05 Comment at 282. They describe as "too fundamental to be compromised" the principle that "[c]rime does and should mean condemnation and no court should have to pass that judgment unless it can declare that the defendant's act was culpable." *Id.* § 2.05 Comment at 283. It should be emphasized that § 2.05 requires that a legislative intent to impose strict liability "plainly appear."

The Code permits liability based upon negligence on much the same grounds as developed by the commentators discussed above. Section 2.02(2)(d) defines negligence as follows:

A person acts negligently with respect to a material element of an offense when he should be aware of a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that the actor's failure to perceive it, considering the nature and purpose of his conduct and the circumstances known to him, involves a gross deviation from the standard of care that a reasonable person would observe in the actor's situation.

While this is arguably an "objective" standard of liability, it contains heightened protections for the individual that are clearly tailored for the criminal law. It speaks of "a substantial and unjustifiable risk" and "a gross deviation," and it focuses on the reasonable person "in the actor's situation." The drafters justify liability based upon a strong form of negligence as follows:

When people have knowledge that conviction and sentence, not to speak of punish-

ment, may follow conduct that inadvertently creates improper risk, they are supplied with an additional motive to take care before acting, to use their faculties and draw on their experience in gauging the potentialities of contemplated conduct. To some extent, at least, this motive may promote awareness and thus be effective as a measure of control. Moreover, moral defect can properly be imputed to instances where the defendant acts out of insensitivity to the interests of other people, and not merely out of an intellectual failure to grasp them.

*Id.* § 2.02 Comment at 243. These comments explain why—on the argument that it has the benefit of inducing caution—strict liability is overbroad. A properly calibrated negligence standard that makes allowance for the truly faultless person accomplishes the same result without sweeping in those upon whom the law can have no effect.

The Code's treatment of mistakes of fact is particularly relevant and important. Section 2.04 of the Code illustrates how the *mens rea* principle can be adhered to without compromising the practical needs and objectives of the penal law. It states,

(1) Ignorance or mistake as to a matter of fact or law is a defense if:

(a) the ignorance or mistake negatives the purpose, knowledge, belief, recklessness or negligence required to establish a material element of the offense; or

(b) the law provides that the state of mind established by such ignorance or mistake constitutes a defense.

(2) Although ignorance or mistake would otherwise afford a defense to the offense charged, the defense is not available if the defendant would be guilty of another offense had the situation been as he supposed.

*Id.* § 2.02.

Particularly relevant to the cases at hand is the second sentence of § 2.04(2). It would make the defendants responsible for, and punishable for, cocaine not heroin. It reads:

In such case, however, the ignorance or mistake of the defendant shall reduce the grade and degree of the offense of which

he may be convicted to those of the offense of which he would be guilty had the situation been as he supposed.

*Id.* § 2.04(2).

The remainder of § 2.04 denies the defense of mistake of law, except in limited circumstances. *Id.* § 2.04(3). As the drafters themselves point out, § 2.04 (at least subsection (1)) is largely superfluous since the culpability requirements of § 2.02 alone preclude conviction in cases of mistake. *Id.* § 2.04 Comment at 270. They explain that "ignorance or mistake has only evidential import; it is significant whenever it is logically relevant...." *Id.* § 2.04 Comment at 269.

Notice that subsection 2.04(2) insists upon full and consistent adherence to the *mens rea* principle. The Code flatly rejects the view, expressed in a similar form as early as the *Prince* case (discussed above) and readily accepted by many federal courts today (as will be described below) that once one commits *some* crime with *some mens rea*, one is liable for *all* criminal actions that result *regardless* of *mens rea*. The Code holds the actor liable only for the crime the actor believed he or she was committing. The drafters thoughtful explanation of § 2.04(2) merits lengthy quotation:

If the [mistake-of-fact] defense were denied altogether, an actor culpable in respect to one offense could be convicted of a much more serious offense. On the other hand, the defendant should not go free, for on either view—the facts as they occurred or as the defendant believed them to be—a criminal offense was committed.

The offense of burglary will illustrate the problem. Burglary is defined generally by Section 221.1 to include entry into any building or occupied structure for the purpose of committing a crime therein, and is graded normally as a felony of the third degree. It is a felony of the second degree, however, if the building is a dwelling of another and the entry is at night. Assume that a defendant enters a building at night for the requisite purpose, and that the building is a dwelling house. If the defendant believed, and formed his belief in a manner that could not be character-

ized as reckless, that the building was a store, he could be convicted only of a third degree felony.

To deny the relevance of the defense of mistake in this situation would be in effect to recharacterize, for this special purpose, the culpability level normally required by the Code for the material element of the more serious offense. Presumably a considered judgment led to the inclusion as a material element the requirement that a building be a dwelling in order to aggravate the offense to a second degree felony; measuring the defendant's culpability toward that element should be an important exercise in grading the extent of the criminality involved. The doctrine that when one intends a lesser crime he may be convicted of a graver offense committed inadvertently leads to anomalous results if it is generally applied in the penal law; and while the principle obtains to some extent in homicide, its generality has rightly been denied.

*Id.* § 2.04 Comment at 272–73.

It is important to understand that the Code's analysis in this respect explicitly applies not only to mistakes as to the *type* of offense, but also to mistakes implicating the *grading* of offenses. *See id.* §§ 1.13(10) (defining "material element" to include all elements not relating to "statute of limitations, jurisdiction, venue" or other matters not related to the harm sought to be prevented or to justifications and excuses) and 2.02 Explanatory Note at 227 (similarly explaining "material element"); *see also id.* § 2.04 Explanatory Note at 268 ("The defendant ... cannot be convicted of *a grade or degree* of offense higher than the offense of which he could have been convicted had the situation been as he supposed." (emphasis added)); Peter W. Low, *The Model Penal Code, The Common Law, and Mistakes of Fact: Recklessness, Negligence or Strict Liability?*, 19 Rutgers L.J. 539, 546–47 (1988) (While "[t]he general position of the common law is almost certainly to the contrary," under the Code "the culpability structure of Section 2.02 is meant to apply to grading criteria as well as to the formal elements of Model Penal Code offenses.").

As LaFave and Scott explain, many courts, especially in cases involving statutory rape, have proceeded on the theory that a mistake-of-fact defense should not be available to the defendant who would have been engaged in "wrongful" conduct even if the facts had been as he or she believed them to be. LaFave and Scott, like the Code, reject this argument:

> The lesser wrong and moral wrong theories ... are grounded upon the proposition that a 'guilty mind,' in a very general sense, should suffice for the imposition of penal sanctions even when the defendant did not intentionally, knowingly, recklessly or even negligently engage in the acts described in the statute.... That position is unsound, and has no place in a rational system of substantive criminal law.... [I]t is generally true that crimes defined in terms of causing a certain bad result require mental fault of the same kind and intensity, and mental fault sufficient for some other kind of crime will not suffice.... This is because considerations of deterrence, correction, and just condemnation of the actor's conduct all focus attention upon the harm intended rather than the harm actually caused.

1 Wayne R. LaFave & Austin W. Scott, *Substantive Criminal Law* 581-83 (1986); *see also State v. Elton*, 680 P.2d 727, 730-31 (Utah Sup.Ct.1984) ("To hold one liable for a greater crime which he actually sought to avoid committing on the ground that he committed a lesser crime turns the doctrine of lesser included offenses on its head and raises fundamental questions which may have constitutional implications."); *cf.* Edwin R. Keedy, *Ignorance and Mistake in the Criminal Law*, 22 Harv.L.Rev. 75, 84 (1908) ("If the defendant, being mistaken as to material facts, is to be punished because his mistake is one which an average man would not make, punishment will sometimes be inflicted when the criminal mind does not exist. Such a result is contrary to fundamental principles, and is plainly unjust, for a man should not be held criminal because of lack of intelligence.").

### d. Current Trends

The seemingly elemental concept of *"mens rea,"* received wisdom for lawyers from the first year of law school, proves exceedingly difficult to tie together neatly once unpacked. Its history has been marked by development, change and shifting attitudes. These problems no doubt will persist. *See* Paul H. Robinson, *A Brief History of Distinctions in Criminal Culpability*, 31 Hastings L.J. 815, 853 (1980) ("The long-range view of history illustrates the irresistible momentum of development.... [A]s the people of 844 recognized only two [culpability distinctions], the people of 2548 may feel justice cannot be done with less than eight.").

Three observations about current trends can be made with some confidence. First, appreciation by the modern criminal law of nuances in mental states continues to increase. *See* Sayre, *Mens Rea, supra,* at 1019 (canonists' concern with evil motive has gradually been replaced with requirement of specific forms of intent for each felony); *see also* Model Penal Code § 2.02; *see generally* Kenneth W. Simons, *Rethinking Mental States*, 72 B.U.L.Rev. 463 (1992) (developing proposal for new framework of mental states based upon distinctions among "culpable-desire" states, "culpable-belief" states and culpable conduct); Gary V. Dubin, Mens Rea *Reconsidered: A Plea for a Due Process Concept of Criminal Responsibility*, 18 Stan.L.Rev. 322 (1966) (reformulating *mens rea* into principles of proscription, conformity and function).

Second, the *mens rea* principle is no longer the sharp-edged canon that the old volumes once described. As society has shifted from punishing moral wrongdoing to "protecting social and public interests," the *mens rea* principle "is coming to mean, not so much a mind bent on evil-doing as an intent to do that which unduly endangers social or public interests." Sayre, *Mens Rea, supra,* at 1017. It may be true that "the hard core of the criminal law is ... riddled with exceptions to the [*mens rea* ] principle" and that "the allegedly pervasive principle of *mens rea* is not pervasive at all." Herbert L. Packer, *Mens Rea and the Supreme Court*, 1962 Sup.Ct. Rev. 107, 138 (1962). Yet this erosion is not

decisive in addressing new problems of the criminal law.

Third, when dealing with an interpretation that may seriously undermine the traditional *mens rea* protections, the conceptions of the late eighteenth century have substantial relevance. Congress can be assumed to want to stay safely within traditional protections of *mens rea* doctrine to avoid unconstitutionality. Absent a clear statement to the contrary this intent can be read into both statutes and Guidelines promulgated by the United States Sentencing Commission (Commission). *Mens rea* remains a fundamental element of crimes. Virtually no one advocates its abandonment. Even Lady Barbara Wootton, *see Crime and the Criminal Law* (1963) 51–63, arguing for a new approach to criminal law under which *mens rea* would be irrelevant at the conviction stage, insists that it should be largely determinative of the appropriate sentence. Her approach would lead to the same result in the instant cases as that of the more traditional *mens rea* theorists.

A survey of the principle's history and its treatment by the leading criminal-law minds of this century reveals that *mens rea* remains a reflection of deep commitments within our culture regarding individual freedom and autonomy and the individual's relationship to the community. Leaving aside the Model Penal Code, the strength of these observations has some tendency to dissipate when we descend from theory into the practical application of the criminal law.

### 3. Constitutional Dimension

#### a. Supreme Court Treatment

Against this doctrinal background, the Supreme Court has issued a series of decisions, some deploying the *mens rea* principle and others giving it slight shrift, that were described thirty years ago as "a mark of inadequate performance in an increasingly important area of [the Court's] adjudication." Herbert L. Packer, *Mens Rea and the Supreme Court,* 1962 Sup.Ct.Rev. 107, 107 (1962); *see also* Henry M. Hart, Jr., *The Aims of the Criminal Law,* 23 Law & Contemp. Probs. 401, 431 (1958) ("From beginning to end, there is scarcely a single opinion by any member of the Court which confronts the question [of *mens rea* ] in a fashion which deserves intellectual respect.").

The more recent opinions have not clarified the picture. This body of law has left unsettled the question of what role the *mens rea* principle plays in our constitutional law. *See* Packer, *supra,* at 107 ("*Mens rea* is an important requirement, but it is not a constitutional requirement, except sometimes."). The tendency of the Supreme Court and, as will be described below, of the lower federal courts to treat *mens rea* problems as ones of simple statutory interpretation has contributed to continuing difficulty. Because *federal* criminal laws are usually in question in federal *mens rea* cases, it is often hard to separate statutory interpretation from constitutional law.

The Supreme Court has addressed the *mens rea* principle in a number of different contexts. The decisions can be divided for convenience into three categories: those that address and accept various strict liability statutes, primarily public-welfare offenses; those that insist on adherence to the *mens rea* principle or allow it to be dispensed with only as to peripheral elements of crimes; and those that treat other issues in a manner that seems to acknowledge at least implicitly the importance of the *mens rea* principle.

Despite a fluttering of views in such areas as burdens of proof and presumptions, the Supreme Court has never abandoned its core analysis of *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), requiring—as a matter of due process—proof beyond a reasonable doubt to be found by a jury "of every fact necessary to constitute the crime . . . charged." *Id.* at 364, 90 S.Ct. at 1072 (agreeing with dissent in New York Court of Appeals of Chief Judge Fuld in a juvenile court case). In his *Winship* concurrence Justice Harlan pointed out that this standard "reflect[s] a very fundamental assessment of the comparative social costs of erroneous factual determinations." *Id.* at 370, 90 S.Ct. at 1075. A fact "necessary to constitute the crime" would, in the absence of a clear constitutionally acceptable enactment by Congress, include any fact constituting the basis for a large enhancement of penalty. *See* Ronald J. Allen, *The Restoration of In re*

*Winship: A Comment on Burdens of Persuasion in Criminal Cases,* 76 Mich.L.Rev. 30, 36–46 (1977) (proof beyond a reasonable doubt required for a given punishment proportional to what the state has proved); John Calvin Jeffries, Jr. & Paul B. Stephen III, *Defenses, Presumptions and Burdens of Proof in the Criminal Law,* 88 Yale L.J. 1325, 1365–79 (1979) (*Winship* "demands, as essential of due process, proof beyond a reasonable doubt of facts sufficient to justify penalties of the sort contemplated."). With this *Winship* guiding lighthouse beam before us we can perhaps escape the shoals and rocks ·of seemingly conflicting Supreme Court precedents.

### i. Strict Liability

The Supreme Court has permitted the imposition of strict liability in a variety of criminal contexts, some involving public welfare-type statutes and ·others involving corporate actors. These decisions, particularly the early ones, provide little in the way of detailed guidance on matters of constitutional law and statutory construction.

In *Shevlin–Carpenter Co. v. Minnesota,* 218 U.S. 57, 30 S.Ct. 663, 54 L.Ed. 930 (1910), the Court, in a form of circular constitutional argument, stated that the due process clause of the fourteenth amendment could not require a state to prove intent because states had frequently permitted criminal liability to attach based upon negligence or under strict liability statutes implicating the "public welfare." *Id.* at 67–68, 30 S.Ct. at 665–66. On the ground that "[a] concession of exceptions would destroy the principle," the Court maintained that it could not rule for the defendants without ruling that all criminal statutes invariably require proof of intent. *Id.* at 68, 30 S.Ct. at 666. It declined to set aside the legislation in question simply "because it is harsh." *Id.* at 69, 30 S.Ct. at 666.

*Shevlin–Carpenter*'s facts are probably more significant than its sweeping reason. The Minnesota statute at issue proscribed penalties for taking lumber without a permit. Defendants had obtained a permit but continued to log after it had expired. The state appellate court overruled the trial court's finding that defendants had acted wilfully,

finding that they mistakenly believed the permit to be valid. The trial court had awarded treble damages to the state, as the statute permitted upon a finding of wilful ·violation, but the appellate court reduced the award to the double damages permitted in a case of involuntary violation. The statute also permitted a sentence of up to two years imprisonment. The Supreme Court explicitly declined the defendants' invitation to treat the statute as unseverable and to consider the constitutional permissibility of a sentence of imprisonment for this offense. *Id.* at 65–67, 30 S.Ct. at 664–65. In effect, the Court held that monetary penalties could be imposed for logging without a permit in the absence of *mens rea.* So understood, *Shevlin–Carpenter* simply recognizes the constitutional validity of strict liability for certain public-welfare offenses carrying fines.

The Court's opinion in *Nash v. United States,* 229 U.S. 373, 33 S.Ct. 780, 57 L.Ed. 1232 (1913), was the occasion for Justice Holmes' celebrated statement that "the law is full of instances where a man's fate depends on his estimating rightly, that is, as a jury subsequently estimates it, some matter of degree." *Id.* at 377, 33 S.Ct. at 781. An indictment under the Sherman Act was challenged on the ground that the statute was too vague for application in the criminal context. Though *mens rea* was not directly at issue, the Court rejected the vagueness claim in a brief discussion in which it maintained that criminal liability is frequently imposed based upon the actor's negligence and, therefore, it is constitutionally permissible to put upon the defendant the risk of criminal conviction should he or she fail to exercise due care. *Id.* at 376–78, 33 S.Ct. at 781–82.

The Court gave perhaps its strongest endorsement to strict liability in *United States v. Balint,* 258 U.S. 250, 42 S.Ct. 301, 66 L.Ed. 604 (1922), though the terse opinion included little in the way of reasoning. The defendants were indicted under the Narcotics Act of 1914 for selling an amount of opium derivative and an amount of coca derivative without completing the required Internal Revenue Service (IRS) form. They complained that the indictment did not charge that they knew the substances to be drugs falling with-

in the statute's reach. The Court stated, "While the general rule at common law was that the scienter was a necessary element in the indictment and proof of every crime ... there has been a modification of this view in respect to prosecutions under statutes the purpose of which would be obstructed by such a requirement." *Id.* at 252, 42 S.Ct. at 302. The Court rejected the notion that due process invariably requires proof of intent, stating, "Many instances of [strict liability] are to be found in regulatory measures in the exercise of what is called the police power where the emphasis of the statute is evidently upon achievement of some social betterment rather than the punishment of the crimes as in cases of mala in se." *Id.* In the case of this statute, Congress' intent to dispense with *mens rea* was clear since the law "merely uses a criminal penalty to secure recorded evidence of the disposition of such drugs as a means of taxing and restraining the traffic." *Id.* at 253, 42 S.Ct. at 302.

Those who have severely criticized the *Balint* decision have probably overstated its significance and continuing import. *See, e.g.,* Sayre, *Public Welfare, supra,* at 80–81 (*Balint* decision can be justified "only on the ground of the extreme popular disapproval of the sale of narcotics"); Herbert L. Packer, *Mens Rea and the Supreme Court,* 1962 Sup.Ct.Rev. 107, 113–15 (1962) ("flimsy" opinion in *Balint* was "egregious" example of Court's casual approach to *mens rea*). It remains a striking and probably anomalous decision because of the severity of penalty the statute allowed: up to a $2000 fine and five years imprisonment. Narcotics Act of 1914, Pub.L. No. 223, § 9, 38 Stat. 785 (1914) (Harrison Act). Nevertheless, the statute must be understood in context. It predated the era during which all possession and sale of drugs came to be regarded as serious crimes. Aside from its penalty, it fairly can be characterized as a regulation. It required manufacturers and distributors of certain narcotics to register with the IRS, pay a special tax of one dollar per year and record all transactions on forms provided by the IRS. *Id.* §§ 1–3 and 8.

As a case about strict liability and narcotics, *Balint* has no application today. Prior to the Harrison Act narcotics had been freely available without prescription. This change by tax statute was a first modest transitional step towards the present complex and serious criminal statutes dealing with narcotics offenses. They have come to be treated as among the most serious of crimes in the federal criminal code. *See, e.g.,* 21 U.S.C. §§ 960 (mandatory minimum sentences as high as 10 years for certain drug offenses); 848(e) (possible sentence of death for drug offenses in which killing results).

The Court also has approved a sort of strict liability-negligence hybrid standard in cases involving criminal liability of corporate officers. In *United States v. Dotterweich,* 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48 (1943), a pharmaceutical company and its president were charged under a statute prohibiting the introduction into interstate commerce of adulterated or misbranded drugs. The jury was divided as to the corporation but convicted the president, Dotterweich, on three counts. The Court described the statute as

> a now familiar type of legislation whereby penalties serve as effective means of regulation. Such legislation dispenses with the conventional requirement for criminal conduct—awareness of some wrongdoing. In the interest of the larger good it puts the burden of acting at hazard upon a person otherwise innocent but standing in *responsible relation* to a public danger.

*Id.* at 280–81, 64 S.Ct. at 136 (emphasis added). After surveying the history of this and other food and drug legislation, *id.* at 281–84, 64 S.Ct. at 136–38, the Court found that Congress intended that there be no requirement of proof of *mens rea* under the law in question:

> Hardship there doubtless may be under a statute which thus penalizes the transaction though consciousness of wrongdoing be totally wanting. Balancing hardships, Congress has preferred to place it upon those who have at least the opportunity of informing themselves of the existence of conditions imposed for the protection of consumers before sharing in illicit commerce, rather than to throw the hazard on

the innocent public who are wholly help-less.

*Id.* at 284–85, 64 S.Ct. at 138. Justice Murphy, joined by three other Justices, dissented on the ground that "[i]t is a fundamental principle of Anglo–Saxon jurisprudence that guilt is personal and ought not lightly ... be imputed to a citizen who, like the respondent, has no evil intention or consciousness of wrongdoing." *Id.* at 286, 64 S.Ct. at 138 (Murphy, J., dissenting).

*Dotterweich* has several limiting aspects. The statute punished the conduct at issue as a misdemeanor. *Id.* at 281, 64 S.Ct. at 136. Not only the penalty but also the matter involved—adulterated or misbranded pharmaceuticals—place the case squarely within the realm of traditional public-welfare offenses. The Court, in language sounding in negligence, spoke of placing the "hazard" and the "hardship" of acting carefully upon the person or persons so situated as to be capable of learning (and perhaps obligated to learn) the facts necessary to understand the risk of harm created. Finally, the Court apparently limited its allowance of vicarious liability of corporate officers to those "standing in responsible relation" to the danger.

*United States v. Park,* 421 U.S. 658, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1975), clarified this "responsible relation" language. Defendants received food that had been shipped in interstate commerce and kept it in a warehouse where it became adulterated. The corporate defendant pled guilty but its president, Park, did not. The evidence showed that Park had some knowledge of and responsibility for ongoing sanitation problems but no involvement with the shipment in question. *Id.* at 661–65, 95 S.Ct. at 1906–08. The Court approved *Dotterweich* 's imposition of liability upon those who have "a responsible share in the furtherance of the transaction which the statute outlaws." *Id.,* 421 U.S. at 670, 95 S.Ct. at 1910 (quoting *Dotterweich,* 320 U.S. at 284, 64 S.Ct. at 138). It ruled that the statute permissibly imposed "not only a positive duty to seek out and remedy violations when they occur but also, and primarily, a duty to implement measures that will insure that violations will not occur." *Id.* 421 U.S. at 672, 95 S.Ct. at 1911. The defendant may come forward, the Court noted, with evidence to support a claim that he or she was "powerless" to prevent the violation. *Id.* at 673, 95 S.Ct. at 1912. The dissent insisted that at least "common-law negligence" must be shown by the government. *Id.* at 683, 95 S.Ct. at 1917 (Stewart, J., dissenting).

*Park* and *Dotterweich* do no more than place a gloss on the Court's general acceptance of strict liability for public-welfare offenses. *See* John Calvin Jeffries, Jr. & Paul B. Stephan III, *Defenses, Presumptions, and Burden of Proof in the Criminal Law,* 88 Yale L.J. 1325, 1375 (1979) ("[N]either *Dotterweich* nor *Park* involved a traditional crime carrying the societal stigma usually associated with criminal conviction, and neither case resulted in a sentence of imprisonment."). In cases involving matters traditionally within the public-welfare realm— dangerous foods, misbranded pharmaceuticals, toxic substances and the like—the strong public interests in enforcing the regulations at issue may arguably be viewed as justifying imposition of a strict duty of supervision and control upon corporate officers. It is, in effect, a *prima facie* strict liability standard because the defendant officer's negligence in presumed. Lack of connection to the harm caused must be established as a defense. *See generally* Ruth Ann Weidel et al., *The Erosion of Mens Rea in Environmental Criminal Prosecutions,* 21 Seton Hall L.Rev. 1100 (1991) (detailing how "responsible corporate officer doctrine" which originated with *Dotterweich* increasingly has been applied to polluters).

The Court's treatment of strict liability in the criminal law continues to provide little guidance with respect to the constitutional status of the *mens rea* principle. The Court's analysis generally has failed to divide clearly statutory interpretation from constitutional law. Two relatively recent cases decided the same term are illustrative. In *United States v. International Minerals & Chem. Corp.,* 402 U.S. 558, 91 S.Ct. 1697, 29 L.Ed.2d 178 (1971), involving a fairly typical example of a public-welfare offense, a corporate defendant was charged with shipping dangerous acids in interstate commerce while

knowingly failing to indicate on the shipping papers that the acids were classified as "Corrosive Liquids" by the Code of Federal Regulations. The Court's holding was straightforward. It observed that this was not a strict liability offense since knowledge of the shipment was required. *Id.* at 560, 91 S.Ct. at 1699. The question was whether knowledge of the regulation also was required. *Id.* Canvassing the legislative history, the Court found that Congress did not intend; any exception to the principle that ignorance of the law is no excuse. *Id.* at 562–64, 91 S.Ct. at 1700–01. But the Court concluded its opinion with the following dicta warning of constitutional limits provided by requirements of *mens rea:*

> There is leeway for the exercise of congressional discretion in applying the reach of *"mens rea."* ... In *Balint* the Court was dealing with drugs, in *Freed* [discussed below] with hand grenades, in this case with sulfuric and other dangerous acids. Pencils, dental floss, paper clips may also be regulated. But they may be the type of products which might raise substantial due process questions if Congress did not require, as in [*United States v. Murdock*, 290 U.S. 389[, 54 S.Ct. 223, 78 L.Ed. 381] (1933)], *"mens rea"* as to each ingredient of the offense. But where, as here and as in *Balint* and *Freed,* dangerous or deleterious devices or products or obnoxious waste materials are involved, the probability of regulation is so great that anyone who is aware that he is in possession of them or dealing with them must be presumed to be aware of the regulation.

*Id.* 402 U.S. at 564–65, 91 S.Ct. at 1701.

*United States v. Freed,* 401 U.S. 601, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971), like *Balint,* involved conduct at least associated with more traditional criminal activity. The statute under consideration made it unlawful for a person to receive or possess a "firearm" not registered to him or her in records kept by the federal government. The statute defined the term "firearm" as limited to a group of highly dangerous devices, including the hand grenades at issue in *Freed.* The trial court dismissed the indictment based upon the failure to allege "scienter." The Supreme Court reversed, stating,

> The presence of a "vicious will" or *mens rea* ... was long a requirement of criminal responsibility. But the list of exceptions grew, especially in the expanding regulatory area involving activities affecting public health, safety, and welfare.

*Id.* at 607, 91 S.Ct. at 1117 (citation omitted). The Court apparently was satisfied that *Freed* could be cabined within the narrow realm of public-welfare offenses:

> The present case is in the category neither of *Lambert* [discussed below] nor *Morissette,* but is closer to *Dotterweich.* This is a regulatory measure in the interest of the public safety, which may well be premised on the theory that one would hardly be surprised to learn that possession of hand grenades is not an innocent act. They are highly dangerous offensive weapons, no less dangerous than the narcotics involved in [*Balint*], where a defendant was convicted of sale of narcotics against his claim that he did not know the drugs were covered by a federal act.

*Id.* 401 U.S. at 609, 91 S.Ct. at 1118. In a concurring opinion, Justice Brennan lamented "the confusion surrounding a difficult, but vitally important, area of the law," *id.* at 612, 91 S.Ct. at 1119, and applied a careful element-by-element *mens rea* analysis taken from the Model Penal Code indicating that Congress did not intend to require knowledge of the unregistered status of the grenades. *Id.* at 610–16, 91 S.Ct. at 1118–21.

ii. *Mens Rea* Generally

A second group of cases have insisted on adherence to the *mens rea* principle or dealt with it on an element-by-element basis. The most vigorous defense of the principle can be found in Justice Jackson's opinion for the Court in *Morissette v. United States,* 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952). Morissette, a scrap collector, removed three tons of spent shell casings from a federal bombing range while on a hunting expedition, believing them to be refuse in which the government no longer had any interest. He was indicted on a charge that he "did unlawfully, wilfully and knowingly steal and con-

vert" the property of the United States. His counsel was prevented from arguing to the jury that Morissette acted with innocent intention. The court instructed the jury that it had to find only that Morissette intended to take the property. The Court rejected the notion that omission of mention of criminal intent from a statute dispenses with the requirement. *Id.* at 250, 72 S.Ct. at 243. Justice Jackson wrote,

> The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil. A relation between some mental element and punishment for a harmful act is almost as instinctive as the child's familiar exculpatory "But I didn't mean to," and has afforded the rational basis for a tardy and unfinished substitution of deterrence and reformation in place of retaliation and vengeance as the motivation for public prosecution.

*Id.* at 250–51, 72 S.Ct. at 243. He also stated, however, that the Court had not "undertaken to delineate a precise line or set forth comprehensive criteria for distinguishing between crimes that require a mental element and crimes that do not" and that it would "attempt no closed definition, for the law on the subject is neither settled nor static." *Id.* at 260, 72 S.Ct. at 248.

After a lengthy discussion of the development and nature of public-welfare offenses, *id.* at 251–60, 72 S.Ct. at 243–48, Justice Jackson concluded that Morissette's offense could not fairly be considered to be among that group of strict liability crimes. He wrote,

> Stealing, larceny, and its variants and equivalents, were among the earliest offenses known to the law that existed before legislation; they are invasions of rights of property which stir a sense of insecurity in the whole community and arouse public demand for retribution, the penalty is high and, when a sufficient amount is involved, the infamy is that of a felony....

*Id.* at 260, 72 S.Ct. at 248. Despite the seeming constitutional dimension to its discussion of the *mens rea* principle, the Court ultimately purported to rule in favor of Morissette on grounds of statutory construction:

> [W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed. In such case, the absence of contrary direction may be taken as satisfaction with widely accepted definitions, not as a departure from them.

> We hold that mere omission from [the statute] of any mention of intent will not be construed as eliminating that element from the crimes denounced.

*Id.* at 263, 72 S.Ct. at 249.

Subsequent cases, in addition to those strict liability decisions already discussed, have cast doubt upon the constitutional endurance of Justice Jackson's insistence upon faithfulness to first principles of *mens rea*. Despite the fact that only Justices Douglas and Stewart dissented from the Court's ruling, *United States v. Feola*, 420 U.S. 671, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975), is a difficult decision to analyze in traditional *mens rea* terms. A federal statute punished assault upon a federal officer engaged in the performance of official duties. Feola and his coconspirators arranged a heroin sale, planning either to pass off a form of sugar to their buyers or simply to steal the purchase money at the time of the transaction. The prospective buyers were in fact federal agents. When one of the officers detected an imminent assault upon a colleague, he drew his weapon. Feola and the others were arrested and charged with conspiring to assault and assaulting federal officers. The Court noted that all parties agreed that "scienter" with respect to the victims' status was not a necessary element of the substantive assault offense. *Id.* at 677, 95 S.Ct. at 1260. Only the conspiracy charge was at issue, but the Court nonetheless believed it necessary to

address the substantive statute in order to reach the question of the conspiracy charge.

The Court began its opinion with what seem to be contradictory statements about the "federal officer" element of the crime. It first stated, "That the 'federal officer' requirement is anything other than jurisdictional is not seriously urged upon us." *Id.* at 676, 95 S.Ct. at 1259. It then said,

> Labeling a requirement "jurisdictional" does not necessarily mean, of course, that the requirement is not an element of the offense Congress intended to describe and punish. Indeed, a requirement is sufficient to confer jurisdiction on the federal courts for what otherwise are state crimes precisely because it implicates factors that are an appropriate subject for federal concern.

*Id.* at 676 n. 9, 95 S.Ct. at 1259 n. 9. The Court's treatment of the *mens rea* problem is clouded by confusion regarding the statute's purposes. It observed,

> The significance of labeling a statutory requirement as "jurisdictional" is not that the requirement is viewed as outside the scope of the evil Congress intended to forestall, but merely that the existence of the fact that confers federal jurisdiction need not be one in the mind of the actor at the time he perpetrates the act made criminal by the federal statute. The question, then, is not whether the requirement is jurisdictional, but whether it is jurisdictional only.

*Id.* The Court concluded that Congress intended both to provide special federal protection for federal law enforcement personnel and to deter obstruction of federal functions. *Id.* at 678–82, 95 S.Ct. at 1260–62. "The rejection of a strict scienter requirement is consistent with both purposes." *Id.* at 679, 95 S.Ct. at 1261. The Court justified dispensing with any *mens rea* requirement as to the officers' status on the grounds that "[i]n a case of this kind the offender takes his victim as he finds him. The concept of criminal intent does not extend so far as to require that the actor understand not only the nature of his act but also its consequence for the choice of a judicial forum." *Id.* at 685, 95 S.Ct. at 1264.

The trouble with *Feola* as a guiding precedent is that it purported to treat the statute as both "an aggravated assault statute," *id.* at 697, 95 S.Ct. at 1270 (Stewart, J., dissenting), and as one involving a federal provision that was "jurisdictional only." But the Court did not acknowledge that some *mens rea* requirement is necessary with respect to the officers' status in order to effectuate Congress' intent to punish assaults upon federal officers more severely. At a minimum, the defendant must know that the assault victim is some kind of official, whether federal or state, *see id.* at 699, 95 S.Ct. at 1271 (Stewart, J., dissenting), or such a provision has no additional deterrent effect beyond the existing general laws prohibiting assaults. The contention that the defendants knew their conduct was criminal is no answer where the legislature is interested in punishing a particular form of assault more severely. One can easily imagine the undercover agents in *Feola* providing their criminal counterparts during their negotiations with assurances that they were real drug dealers and not law enforcement officers. *Feola* is typical of the failure, exhibited in many of the decisions of the lower federal courts discussed below, to apply the integral connections between the *mens rea* principle and the general purposes of the criminal law.

*United States v. Yermian*, 468 U.S. 63, 104 S.Ct. at 2936, 82 L.Ed.2d 53 (1984), adds no clarification to *Feola*. The defendant was charged with making a false statement in a matter within the jurisdiction of the United States. The question for the Court was whether the government had to prove not only that the defendant knew the statement to be false but also that he knew of the federal agency jurisdiction. The defendant had falsely completed a government security questionnaire provided to him by his employer, a defense contractor. Unlike in *Feola*, the Court did not struggle with the question of the legislative purpose behind the "federal agency" requirement. Here, the element was plainly "jurisdictional" and served only "to identify the factor that makes the false statement an appropriate subject for federal concern." *Id.* 468 U.S. at 68, 104 S.Ct. at 2939. Otherwise, the Court believed, Con-

gress would have included language like "with intent to defraud the United States." *Id.* at 73, 104 S.Ct. at 2941. The Court was not concerned with the possibility that the statute might trap the unwary, though it left open the question whether a test of reasonable foreseeability should be applicable. *See id.* at 75 n. 14, 104 S.Ct. at 2942 n. 14; *see also United States v. Bakhtiari,* 913 F.2d 1053 (2d Cir.1990) (no lesser standard of culpability, such as foreseeability or negligence, is required for violation of statute at issue in *Yermian* ), *cert. denied,* —— U.S. ——, 111 S.Ct. 1319, 113 L.Ed.2d 252 (1991). In somewhat conclusory fashion, the Court said that even if one could characterize lying on such a form "as 'wholly innocent conduct,' this argument is not sufficient to overcome the express statutory language of § 1001." *Id.* 468 U.S. at 74, 104 S.Ct. at 2942. In a dissent joined by three other Justices, Justice Rehnquist found the statute hopelessly ambiguous and maintained, therefore, that the "rule of lenity" required that the ambiguity be resolved in the defendant's favor. *Id.* at 75–84, 104 S.Ct. at 2942–47. He, unlike the · majority, was concerned about the "broad range of conduct" that would be swept within the statute's coverage under the Court's ruling. *Id.* at 83, 104 S.Ct. at 2946.

Yet another case involving the specific *mens rea* requirements of a federal criminal statute was *Liparota v. United States,* 471 U.S. 419, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985). The defendant, owner of a sandwich shop, purchased food stamps from an undercover agent for substantially less than their face value. He was not authorized to take food stamps. The applicable statute made it a crime to knowingly receive the stamps in a manner not authorized by law. The defendant argued that the government was obligated to prove that he knew not only that he acquired the stamps but also that he did so in an unauthorized manner. The Court claimed to treat the problem as entirely one of statutory interpretation, stating, "The definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes, which are solely creatures of statute." *Id.* at 424, 105 S.Ct. at 2087; *but see id.* at 424 n. 6, 105 S.Ct. at 2087 n. 6 ("Of course, Congress must act within any applicable constitutional constraints in defining criminal offenses. In this case, there is no allegation that the statute would be unconstitutional under either interpretation."). In an approach similar to that of Justice Rehnquist in his dissent in *Yermian,* the Court found nothing in the law or its legislative history to serve as a guide. Accordingly, it held that a showing that defendant knew his acquisition was unauthorized was required. *Id.* 471 U.S. at 425, 105 S.Ct. at 2088.

In addition to pointing to the "rule of lenity" in support of this conclusion, *id.* at 427, 105 S.Ct. at 2089, the Court quoted from Justice Jackson's opinion in *Morissette* and maintained that "the failure of Congress explicitly and unambiguously to indicate whether *mens rea* is required does not signal a departure from this background assumption of our criminal law." *Id.* 471 U.S. at 426, 105 S.Ct. at 2088. It added, "This construction is particularly appropriate where, as here, to interpret the statute otherwise would be to criminalize a broad range of apparently innocent conduct." *Id.* The Court rejected the notion that the offense at issue was of the public-welfare type, characterizing those crimes as involving "conduct that a reasonable person should know is subject to stringent public regulation and may seriously threaten the community's health or safety." *Id.* at 433, 105 S.Ct. at 2092. The dissenters objected that the Court had violated another "background assumption" of the criminal law by allowing a mistake-of-law defense. *Id.* at 434–43, 105 S.Ct. at 2092–97.

*Feola, Yermian* and *Liparota* leave in considerable doubt the continuing force of some of Justice Jackson's eloquent statements about *mens rea* in *Morissette.* Yet they supply no alternative, coherent account of the role of *mens rea* in federal constitutional and statutory law. As in the cases dealing with strict liability statutes, there appears to be an important and perhaps inviolable unarticulated protective principle lurking in the background.

In *United States v. Bailey,* 444 U.S. 394, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980), the Court sought the assistance of the Model Penal Code in determining the precise culpa-

bility requirements of the various elements of the federal prison-escape statute. While stating that "courts obviously must follow Congress' intent as to the required level of mental culpability for any particular offense," *id.* at 406, 100 S.Ct. at 632, it justified use of the Model Penal Code on the ground that "in enacting the Federal Criminal Code Congress legislated in light of a long history of case law that is frequently relevant in fleshing out the bare bones of a crime Congress may have proscribed in a single sentence." *Id.* at 397, 100 S.Ct. at 628. *Bailey* thus suggests that Congress must be deemed to legislate with the historical and philosophical limits of *mens rea* in mind absent a specifically expressed design not to do so.

### iii. Other Cases

#### (a) First Amendment

The brooding presence of the *mens rea* principle can be found elsewhere in the Court's decisions. The first amendment may require a showing of *mens rea* in certain contexts. In *Smith v. California*, 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959), the Court declined to treat a statute imposing strict liability for possession of obscene books as a public-welfare offense because of the potential chilling effect of such a law on free expression. A seller of books, in the Court's view, could not be treated in the same manner as a distributor of impure food, who acts at the risk of violating a strict liability statute. *Id.* at 152, 80 S.Ct. at 218. In *Dennis v. United States*, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951), the Court held that the Smith Act required a showing of intent to overthrow the government by force or violence because "[t]he existence of a *mens rea* is the rule, rather than the exception to, the principles of Anglo–American jurisprudence." *Id.* at 500, 71 S.Ct. at 862.

#### (b) Void-for-Vagueness

*Mens rea* also seems to play a role in the Court's void-for-vagueness jurisprudence. In *Screws v. United States*, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945), the Court addressed the criminal analog to what is now 42 U.S.C. § 1983. It read a "specific intent" requirement into the statute in order to cure the law's vagueness defect, stating,

The Court, indeed, has recognized that the requirement of a specific intent to do a prohibited act may avoid those consequences to the accused which may otherwise render a vague or indefinite statute invalid. The constitutional vice in such a statute is the essential injustice to the accused of placing him on trial for an offense, the nature of which the statute does not define and hence of which it gives no warning.... [A] requirement of a specific intent to deprive a person of a federal right made definite by decision or other rule of law saves the Act from any charge of unconstitutionality on the grounds of vagueness.

*Id.* at 101, 65 S.Ct. at 1035.

It is not surprising that the Court's vagueness jurisprudence should include treatment of the *mens rea* principle. There is much similarity between saying that a law is unconstitutional because it punishes the person who lacks criminal intent and saying it is unconstitutional because it captures the person who cannot know whether that law applies to his or her conduct. *Cf. Papachristou v. City of Jacksonville*, 405 U.S. 156, 162–63, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1972) (even a requirement of specific intent, as adopted in *Screws*, would not prevent the unwitting from being ensnared in the net of unconstitutionally vague "vagrancy" laws). In either type of case, the constitutional aversion is to capturing the unwitting person who did not seek to violate the law. The void-for-vagueness cases appear to be a catch-all category that encompasses a variety of requirements sharing the common quality of being fundamental to traditional notions of how the criminal law can and should operate. *See generally* Anthony G. Amsterdam, Note, *The Void-for-Vagueness Doctrine in the Supreme Court*, 109 U.Pa.L.Rev. 67 (1960) (explaining complex set of constitutional values protected in void-for-vagueness cases).

#### (c) *Actus Reus*

Finally, there are a group of cases that seem to suggest that the theoretical companion to the *mens rea* principle—the requirement of an affirmative criminal act or omission, or *actus reus*—may have some constitutional stature. In *Lambert v. California*, 355

U.S. 225, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957), the Court ruled unconstitutional a Los Angeles city ordinance making it illegal for a convicted felon to remain within the city for more than five days without registering with the government. The Court apparently was troubled by the lack of both a knowledge element and an act requirement in the statute. It stated, "There is wide latitude in the lawmakers to declare an offense and to exclude elements of knowledge and diligence from its definition," *id.* at 228, 78 S.Ct. at 242, but observed that the "conduct" at issue was "unlike the commission of acts, or the failure to act under circumstances that should alert the doer to the consequences of his deed." *Id.* The Court concluded that the due process requirement of fair notice mandated "that actual knowledge of the duty to register or proof of the probability of such knowledge and subsequent failure to comply are necessary before conviction under the ordinance can stand." *Id.* at 229, 78 S.Ct. at 243.

The principles of *Lambert* may have been extended in *Robinson v. California*, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962), in which the Court declared unconstitutional a California statute making narcotics addiction alone a criminal offense. Primarily on the belief that narcotics addiction is a passive illness like insanity, the Court ruled that this "status" offense violated the eighth amendment's prohibition against cruel and unusual punishment. *Id.* at 667, 82 S.Ct. at 1420; *see also id.* at 674, 82 S.Ct. at 1424 (Douglas, J., concurring) ("If addicts can be punished for their addiction, then the insane can also be punished for their insanity."). "Even one day in prison would be a cruel and unusual punishment for the 'crime' of having a common cold." *Id.* at 667, 82 S.Ct. at 1420.

*Robinson* was limited by *Powell v. Texas*, 392 U.S. 514, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968). There the Court, in a four-Justice plurality opinion written by Justice Marshall, upheld a Texas law punishing by fine the "act" of getting drunk or being intoxicated. The defendant was found drunk in public. Seeking the advantage of *Robinson*, he argued that he suffered from the disease of alcoholism. The Court declined the invita-

tion to rule alcoholism a disease. *Id.* 392 U.S. at 522, 88 S.Ct. at 2149. It distinguished *Robinson* as follows:

> The entire thrust of *Robinson*'s interpretation of the Cruel and Unusual Punishment Clause is that criminal penalties may be inflicted only if the accused has committed some act, has engaged in some behavior, which society has an interest in preventing, or perhaps in historical common law terms, has committed some *actus reus*. It thus does not deal with the question of whether certain conduct cannot constitutionally be punished because it is, in some sense, "involuntary" or "occasioned by a compulsion."

*Id.* 392 U.S. at 533, 88 S.Ct. at 2154. The Court said it was unable to conclude that alcoholism caused an irresistible compulsion to drink and get drunk in public, adding,

> And in any event this Court has never articulated a general constitutional doctrine of *mens rea* . . . . The doctrines of *actus reus, mens rea,* insanity, mistake, justification, and duress have historically provided the tools for a constantly shifting adjustment of the tension between the evolving aims of the criminal law and changing religious, moral, philosophical, and medical views of the nature of man. This process of adjustment has always been thought to be the province of the States.

*Id.* at 535–36, 88 S.Ct. at 2155–56; *see also id.* at 537, 88 S.Ct. at 2156 (Black, J., concurring) (ruling for Powell would be "announcing a revolutionary doctrine of constitutional law").

Though in *Powell* the Court stepped back from what it viewed as a precipice created by *Robinson*, the two opinions indicate a strong constitutional aversion to punishing those who, because of "disease" or similar condition, lack the free will necessary to conform their conduct to the law. *See Pottinger v. City of Miami*, 810 F.Supp. 1551, 1561–1565 (S.D.Fla.1992) (per *Robinson*, Miami's practice of arresting homeless persons for sleeping, eating and performing like activities in public violates eighth amendment since homeless "have no realistic choice but to live in public places" and are compelled to per-

form basic functions there). In his dissenting opinion in *Powell*, Justice Fortas, joined by three other Justices, stated,

> *Robinson* stands upon a principle which, despite its subtlety, must be simply stated and respectfully applied because it is the foundation of individual liberty and the cornerstone of the relations between a civilized state and its citizens: Criminal penalties may not be inflicted upon a person for being in a condition that he is powerless to change.... [Robinson] was powerless to choose not to violate the law.

*Powell*, 392 U.S. at 567, 88 S.Ct. at 2171.

The *mens rea* principle is directly implicated here. The person who does not know the relevant facts making his or her conduct criminal is as "powerless to choose not to violate the law" as the addict or lunatic. *See* Herbert L. Packer, *Mens Rea and the Supreme Court*, 1962 Sup.Ct.Rev. 107, 123 (1962) ("If 'fair warning' is a constitutional requisite in terms of the language of a criminal statute, why is it not also a constitutional requisite so far as the defendant's state of mind with respect to his activities is concerned?"); *see also* Anthony A. Cuomo, Mens Rea *and Status Criminality*, 40 S.Cal.L.Rev. 463, 474 (1967) (in *Robinson*, the Supreme Court was given the opportunity but failed to explore the relationship between status offenses and *mens rea*).

### b. Due Process Analysis

Academic commentators are in general agreement that this collection of Supreme Court decisions give the *mens rea* principle uncertain constitutional status. *See, e.g.*, 1 Wayne R. LaFave & Austin W. Scott, *Substantive Criminal Law* 219, 346–58 (1986) (not clear precisely what constitutional limitations exist on the imposition of strict liability); Herbert L. Packer, *Mens Rea and the Supreme Court*, 1962 Sup.Ct.Rev. 107, 138 (1962) ("What might be called the unconscious abandonment of *mens rea* is a major embarrassment to any attempt to construct a constitutional doctrine of *mens rea*."); John Calvin Jeffries, Jr. & Paul B. Stephan III, *Defenses, Presumptions, and Burden of Proof in the Criminal Law*, 88 Yale L.J. 1325, 1374 (1979) ("Constitutional acceptance

of a requirement of culpability ... is at best uncertain.").

Just as the constitutional status of the *mens rea* principle cannot be conclusively determined, neither can it be ignored. The cases, despite their uneven nature, impart a clear message that there is a continuing constitutional importance to the *mens rea* principle. The outer limits of what is permissible have not been drawn, but such limits certainly exist. As one commentator has observed,

> What sense does it make to insist upon procedural safeguards in criminal prosecutions if anything whatever can be made a crime in the first place? What sense does it make to prohibit ex post facto laws (to take one explicit guarantee of the Federal Constitution on the substantive side) if a man can, in any event, be convicted of an infamous crime for inadvertent violation of a prior law of the existence of which he had no reason to know and which he had no reason to believe he was violating, even if he had known of its existence?

Henry M. Hart, Jr., *The Aims of the Criminal Law*, 23 Law & Contemp. Probs. 401, 431 (1958); *see also* James J. Hippard, *The Unconstitutionality of Liability without Fault*, 10 Hous.L.Rev. 1039, 1058 (1973) ("[The] constitutional right to a presumption of innocence is a hollow right indeed if a legislature can eliminate any substantive element of a crime that suits its utilitarian purposes of the moment.").

On either an historically based or a more fluid view of the content of the due process clause, the *mens rea* principle must be given constitutional effect. The various doctrines of culpability encompassed by the principle of *mens rea* are as deeply rooted as any fundamental rules of law still operative today. As already noted, the concept of *mens rea* can be traced to Plato and, since the Middle Ages, has been an integral part of the fabric of the English common law from which we have drawn our own criminal and constitutional analysis. The legal framework against which the Framers of the United States Constitution operated included a strong commitment to individual blameworthiness as the chief determinant of criminal liability. *See* Henry M. Hart, Jr., *The Aims of the Crimi-*

*nal Law*, 23 Law & Contemp. Probs. 401, 423 (1958) ("In the tradition of Anglo–American law, guilt of crime is personal. The main body of the criminal law, from the Constitution on down, makes sense on no other assumption."); *id.* at 434 (It is nonsensical to assume that "the views of Blackstone should be ... cavalierly overridden in interpreting a Constitution written by men who accepted his pronouncements as something approaching gospel.").

History cannot be ignored. In the plurality opinion in *Burnham v. Superior Court of California*, 495 U.S. 604, 110 S.Ct. 2105, 109 L.Ed.2d 631 (1990), for example, Justice Scalia approached the question of the fairness, for due process purposes, of asserting personal jurisdiction solely on the basis of physical presence in the forum state by primarily looking to the historical treatment of the practice. Particularly important to Justice Scalia was his conclusion upon surveying the relevant history that "[t]his practice is ... not merely old; it is continuing." *Id.* at 615, 110 S.Ct. at 2113. Age and repetition, on this view, are important factors in determining whether a particular practice "is one of the continuing traditions of our legal system that define the due process standard of 'traditional notions of fair play and substantial justice.'" *Id.* at 619, 110 S.Ct. at 2115.

Similarly, in *Sun Oil Co. v. Wortman*, 486 U.S. 717, 108 S.Ct. 2117, 100 L.Ed.2d 743 (1988) (Scalia, J.), the Court ruled that statutes of limitations are procedural, for the purposes of the both the full faith and credit clause and the due process clause of the fourteenth amendment, on the grounds that this had been the historical practice and consensus view when the two constitutional provisions were adopted and that the practice had persisted to the present. The Court observed, "'If a thing has been practised for two hundred years by common consent, it will need a strong case for the Fourteenth Amendment to affect it.'" *Id.* at 730, 108 S.Ct. at 2126 (quoting *Jackman v. Rosenbaum Co.*, 260 U.S. 22, 31, 43 S.Ct. 9, 9, 67 L.Ed. 107 (1922)); *see also Michael H. v. Gerald D.*, 491 U.S. 110, 123, 109 S.Ct. 2333, 2341, 105 L.Ed.2d 91 (1989) (plurality opinion) (Scalia, J.) (in substantive due process context, cases indicate "insistence that the asserted liberty interest be rooted in history and tradition").

Such an historical approach, if accepted, applies equally to the question what process is due in criminal cases. For example, in *Griffin v. United States*, —— U.S. ——, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991) (Scalia, J.), the issue before the Court was whether a general verdict on a multiple-object conspiracy charge must be set aside if the evidence is concededly insufficient with respect to one object. The Court concluded that "[t]he historical practice ... fails to support petitioner's claim under the Due Process Clause of the Constitution." *Id.* at ——, 112 S.Ct. at 470. An examination of such authorities as Wharton, Bishop and Lord Mansfield revealed that "[i]t was settled law in England before the Declaration of Independence, and in this country long afterwards, that a general jury verdict was valid so long as it was legally supportable on one of the submitted grounds." *Id.* at ——, 112 S.Ct. at 469.

In interpreting the sixth amendment the Court has long applied a similar analysis in recognizing the confluence of common-law hearsay rules and the confrontation clause. *See White v. Illinois*, —— U.S. ——, ——, 112 S.Ct. 736, 741, 116 L.Ed.2d 848 (1992) (Rehnquist, C.J.).

*Mens rea* requirements have traditionally and historically been, and continue to be today, the rule rather than the exception in the application of the criminal law. Criminal defendants should have a reasonable and settled expectation that, absent some special previously explicated justification, their culpability and blameworthiness will be determined with reference to their mental state.

Even without the overwhelming evidence of history and tradition showing adherence to the *mens rea* principle in the Anglo–American legal tradition, fundamental conceptions of fairness would dictate that a general culpability requirement be deemed an essential aspect of due process. *See* John Calvin Jeffries, Jr. & Paul B. Stephan III, *Defenses, Presumptions, and Burden of Proof in the Criminal Law*, 88 Yale L.J. 1325, 1376 (1979) ("As a question of principle ... there can be little doubt of the morally objectionable char-

acter of liability without fault or of its inconsistency with the traditional Anglo–American concept of fairness to the individual."). As both H.L.A. Hart and Henry Hart have explained in carefully analyzing the theoretical underpinnings of the *mens rea* principle, individual culpability and infliction of punishment in proportion to the harm intended are vital to a democracy and society founded upon individual freedom, choice and responsibility.

The view that the widespread acceptance of exceptions to the *mens rea* principle and of forms of strict liability indicates that the principle does not enjoy constitutional status is dubious. *See, e.g.,* Herbert L. Packer, *Mens Rea and the Supreme Court,* 1962 Sup.Ct.Rev. 107, 142 (1962) (fact that *mens rea* exceptions are common "surely has some relevance to the question whether *mens rea* is so fundamental a conception, so essential to 'ordered liberty,' that it must be protected by force of the Due Process Clause."). Such a view misses Professor Amsterdam's astute perception of how the due process clause is a moderating force that mediates between the needs of orderly government and individual rights of freedom and autonomy:

> [I]t is the essence and cardinal aim of due process to minimize the frequency and gravity of those occasions, in a society, when it is necessary to reach the issue of ultimate power. 'Ordered liberty'—both halves of the rubric are critical. Can order and liberty be reconciled somewhere short of the poles at which terror of slavery, on the one hand, and terror of social disintegration, on the other, assert their categorical demands for the sacrifice of one of those values to the other? ... The premise of due process seems to be that for the very great majority of situations an adjustment is possible and that, given regular procedures, the working forces of a culture will arrive at such an adjustment— if only it is not the cultural habit to rush at once to ultimates in every case. The matter is largely one of methodology.

Anthony G. Amsterdam, Note, *The Void-for-Vagueness Doctrine in the Supreme Court,* 109 U.Pa.L.Rev. 67, 115 (1960).

It would not be at all inconsistent to say both that the Constitution admits strict liability in certain circumstances and that it requires adherence to the *mens rea* principle in others. Such distinctions are common to constitutional doctrine. The question what process is due is largely a question how, in light of longstanding and evolving practices, the needs of the individual can be accommodated to the needs of society. This analysis is informed by considerations both of orderly and effective administration of justice and of fundamental constitutional commitments to individual autonomy and just punishment.

Such an analysis is not easy. The *mens rea* principle may enjoy some constitutional status, but it is far more difficult to determine precisely what shape a constitutional doctrine of *mens rea* might take and exactly how far a legislature permissibly could go in dispensing with the mental elements of crime. The doctrine of public-welfare offenses, for example, surely has some outer boundary. The term itself carries no limitation of its own since every crime—particularly those with serious consequences and heavy punishment—threatens the public welfare. Presumably, the broad outlines of the common-law category of those offenses involving noxious substances, light penalties and the like would aid the determination whether a given strict liability statute was constitutionally permissible.

It is nearly impossible to predict how the Supreme Court would now rule if faced directly with such a question. That sort of inquiry is not necessary in the instant cases, which do not require determination of whether a statute should be declared void for failing to include a constitutionally necessary element. At issue here is only the culpability of specific defendants at the sentencing stage. Guilt already has been determined. Only calibration of blameworthiness is now required.

It is sufficient to conclude that due process interests may be implicated. This conclusion requires that the relevant statutes and guidelines be applied, if possible, in such a way as to avoid constitutional defect. *See Rust v. Sullivan,* —— U.S. ——, ——, 111 S.Ct. 1759, 1788–89, 114 L.Ed.2d 233 (1991) (O'Connor,

J., dissenting). Such a prudential approach is particularly appropriate in a context in which the Supreme Court has conflated constitutional law and statutory interpretation. There is plainly much practical avoidance of constitutional questions at work in the Court's *mens rea* cases, even if the "canon of avoidance" is not formally invoked. Rather than attempting the difficult, and perhaps impossible, task of extracting the constitutional from the statutory in those decisions, it is better to follow the Court's own apparent practice of vindicating the Constitution indirectly by applying statutes in a manner that accommodates the needs of both the government and the individual. The assumption that Congress legislates against the background of the common-law *mens rea* principle can perform much of this work.

Finally, the rule of lenity, utilized when there is a doubt about harshness of result, can be applied to harmonize the applicable statutes with the Constitution. Statutory ambiguities have long been resolved in favor of criminal defendants. A court should "not interpret a federal criminal statute so as to increase the penalty that it places on an individual when such an interpretation can be based on no more than a guess as to what Congress intended." *Ladner v. United States,* 358 U.S. 169, 178, 79 S.Ct. 209, 214, 3 L.Ed.2d 199 (1958). "[T]his principle of statutory construction applies not only to interpretations of the substantive ambit of criminal prohibitions, but also to the penalties they impose." *Bifulco v. United States,* 447 U.S. 381, 387, 100 S.Ct. 2247, 2252, 65 L.Ed.2d 205 (1980). Congress can be assumed to legislate with knowledge of this frequently invoked prudential rule. Where there is an intent to punish more severely, therefore, a clear congressional statement can be expected.

In short, it should be assumed that Congress does not intend to violate the Constitution unless clear indication can be found otherwise. As will be seen, no such contrary evidence can be found in the law applicable to these cases.

### 4. Lower Federal Courts

The prevailing approach to *mens rea* in the lower federal courts has been to forego careful statutory interpretation and application. With a few exceptions, the courts have proceeded with little articulated analysis of the constitutional values at stake and of the Supreme Court's own treatment of the *mens rea* principle. The sparse theoretical justifications provided for rulings in the context of harsh new drug laws and new guideline sentencing is understandable since the issues generally have not yet been carefully posed by litigants still struggling to make sense of this startling new phase of criminal law.

Some of the failure to analyze *mens rea* requirements can be attributed to the awkward nature of the federal criminal law. Because Congress has never enacted a comprehensive criminal code, as have most of the states, and generally has not adopted blanket statutes that bear upon the application of all specific substantive provisions, the federal courts have been left the task of creating common law to fill the interstices of a somewhat erratic statutory scheme. *See* Kenneth R. Feinberg, *Toward a New Approach to Proving Culpability: Mens Rea and the Proposed Federal Criminal Code,* 18 Am.Cr. L.Rev. 123 (1980) (detailing confusion in federal law of culpability and arguing for adoption of uniform standards embodied in congressional proposal which did not become law); Matthew T. Fricker & Kelly Gilchrist, Comment, United States v. Nofziger *and the Revision of 18 U.S.C. § 207,* 65 Notre Dame L.Rev. 803, 805 (1990) ("Title 18 gives no explicit direction to judges, jurors, lawyers, or citizens on how to determine the *mens rea* requirements, if any, for each element of offenses defined in it.... Where order should reign, chaos prevails."). Rather than looking to common-law traditions for assistance, the courts, though acting with the intention of deferring to Congress, have frequently violated those traditions in a manner that is probably inconsistent with congressional design.

Lower federal courts have found a variety of modern laws to fit the traditional public-welfare offense category. In *Tart v. Massachusetts,* 949 F.2d 490 (1st Cir.1991), for example, the Court of Appeals for the First Circuit confronted a constitutional challenge to a state statute prohibiting the landing of

raw fish without a commercial permit. It rejected the defendant's claim that the due process clause required proof of some mental element for conviction, maintaining that, since the "offense of landing raw fish without a permit is a regulatory offense not known at common law, legislative silence should not be construed to import a common law *mens rea* requirement." *Id.* at 502. It relied heavily on the slight sentence typical of regulatory offenses, noting, "[A] thirty-day maximum term of imprisonment and a maximum fine of fifty dollars does not infringe due process." *Id.* at 503.

In *United States v. Engler,* 806 F.2d 425 (3d Cir.1986), *cert. denied,* 481 U.S. 1019, 107 S.Ct. 1900, 95 L.Ed.2d 506 (1987), the Court of Appeals for the Third Circuit attempted to describe the constitutional limits of the public-welfare offense doctrine. The defendant was charged with selling protected wildlife in violation of the Migratory Bird Treaty Act. The law originally punished the offense as a misdemeanor and contained no scienter element. It was then amended to add a felony provision applying to those who violated the law for commercial purposes. No scienter element was included in the amendment. The district court dismissed the felony charge on constitutional grounds. The court of appeals, refusing to read a *mens rea* provision into the statute as urged by the government, confronted the constitutional question and ruled that the law was permissible under the due process clause.

The court began,

> The Supreme Court ... has long recognized that a different standard applies to those federal criminal statutes that are essentially regulatory, that are designed to protect the public welfare, and that do not have their origins in the common law.

*Id.* 806 F.2d at 431. Even though the government had conceded in the court of appeals that the absence of a *mens rea* provision in this law would violate the due process clause, the court maintained that the district court had "ignored a formidable line of cases imposing strict liability in felony cases without proof of scienter." *Id.* at 433. The court of appeals simply disagreed with the district court's evaluation of the severity of the statute:

> [T]he district court decision here made a judgment call that does not withstand reasonable analysis. [It held] that the differences between a felony fine of $2,000 and a misdemeanor fine of $500, between a two-year felony sentence and a six-month misdemeanor sentence, between the stigma of a felony conviction and that of a misdemeanor conviction turn the trick on constitutionality. Mechanical jurisprudence has no place here. The constitutionality of acts of Congress should not be determined by such nice distinctions with tight mathematical formulas derived from a pocket calculator or a computer spread sheet. The differences between the objective penalties of the misdemeanor and felony provisions of the Act is, for due process purposes, *de minimis.*

*Id.* at 434. The only justification provided, however, for the court of appeals' own plain line-drawing was the view that

> due process is not violated by the imposition of strict liability as part of a "regulatory measure in the interest of public safety, which may well be premised on the theory that one would hardly be surprised to learn that [the prohibited conduct] is not an innocent act."

*Id.* at 435 (quoting *United States v. Freed,* 401 U.S. 601, 609, 91 S.Ct. 1112, 1118, 28 L.Ed.2d 356 (1971)). As the drafters of the Model Penal Code and others have explained, the claim that the defendant's conduct is somehow illegal or wrong does not satisfactorily answer the question exactly how much or what type of criminal liability should attach. The question before the court in *Engler* was not whether the defendant should be punished, but whether he would be liable under the misdemeanor or the felony provision of the statute.

The approach of the Court of Appeals for the Sixth Circuit to the identical problem seems to accord more with traditional standards. In *United States v. Wulff,* 758 F.2d 1121 (6th Cir.1985), which was explicitly rejected by the *Engler* court, the court ruled that the Constitution required proof of scienter under the felony provision of the same

wildlife-protection statute. The court stated the constitutional test emphasizing the degree of punishment as follows:

> The elimination of the element of criminal intent does not violate the due process clause where (1) the penalty is relatively small, and (2) where the conviction does not gravely besmirch.

*Id.* 758 F.2d at 1125. The court divined its analysis from then-Judge Blackmun's opinion in *Holdridge v. United States*, 282 F.2d 302 (8th Cir.1960), in which he stated,

> [W]here a federal criminal statute omits mention of intent and where it seems to involve what is basically a matter of policy, where the standard imposed is, under the circumstances, reasonable and adherence thereto properly expected of a person, where the penalty is relatively small, where conviction does not gravely besmirch, where the statutory crime is not one taken over from the common law, and where congressional purpose is supporting, the statute can be construed as one not requiring criminal intent. The elimination of this element is then not violative of the due process clause.

*Id.* at 310; *see also United States v. Collins*, 949 F.2d 1029 (8th Cir.1991) (specific intent to violate law need not be shown under statute, carrying maximum penalty of $1,000 fine and one year in prison, that prohibits improperly storing explosives and failing to notify government of acquisition).

The task of delineating the contours of the public-welfare offense doctrine seems, at least initially, better approached by focusing on the severity of the offense than on its type. It is too difficult and of increasingly less significance in the context of today's complex federal criminal law to draw lines based upon what is or is not "regulatory," what does or does not derive from the common law, what does or does not affect the "public welfare" and the like.

The analysis of the courts of appeals of *mens rea* problems has been particularly weak in narcotics cases. *See, e.g., United States v. Pruitt*, 763 F.2d 1256, 1261–62 (11th Cir.1985) (under statute providing greater penalties for selling drugs to persons under twenty-one, defendant's knowledge of buyer's age need not be proven since, by analogy, knowledge is not required with respect to interstate commerce elements of federal crimes), *cert. denied*, 474 U.S. 1084, 106 S.Ct. 856, 88 L.Ed.2d 896 (1986). In *United States v. Holland*, 810 F.2d 1215 (D.C.Cir.), *cert. denied*, 481 U.S. 1057, 107 S.Ct. 2199, 95 L.Ed.2d 854 (1987), for example, the court examined a statute providing an enhanced penalty for selling drugs within 1000 feet of a school. The court ruled that the defendant need not know that he or she is within 1000 feet of a school in order for the greater penalties to apply. The heart of the court's approach was conveyed in the following passage:

> It is easily concluded here that Congress' heightened interest in protecting children from both the indirect and direct perils of drug traffic amply supports its decision not to require a showing of *mens rea* of the proximity of a school. A reasonable person would know that drug trafficking is subject to stringent public regulation because it can seriously threaten the community's health and safety, particularly as it relates to the community's heightened concern for the health, safety and welfare of its children.

*Id.* 810 F.2d at 1223–24. Such conclusory reasoning is common in modern federal narcotics cases. Because drugs are dangerous and because those who get involved with them know their conduct is illegal, the argument goes, the greatest available level of punishment is appropriately inflicted without regard to *mens rea*. This argument ignores the fundamental theoretical foundations of the criminal law. To assume that Congress would adopt a heightened penalty without requiring a showing of knowledge in this context is to assume that Congress acted irrationally. The objective of discouraging drug dealing near schools is in no way furthered by punishing those who are ignorant of their location.

Where courts have been more understanding of the *mens rea* principle is in cases in which there is a sense that wholly "innocent" persons may be ensnared. In *United States v. Nofziger*, 878 F.2d 442 (D.C.Cir.), *cert. denied*, 493 U.S. 1003, 110 S.Ct. 564, 107

L.Ed.2d 559 (1989), the Court.of Appeals for the District of Columbia Circuit readily applied a "presumption of *mens rea*," *id.* 878 F.2d at 453, in determining congressional intent because the crime at issue was a felony and " 'to interpret the statute otherwise would be to criminalize a broad range of apparently innocent conduct.' " *Id.* (quoting *Liparota v. United States,* 471 U.S. 419, 426, 105 S.Ct. 2084, 2088, 85 L.Ed.2d 434 (1985)). The defendant · had· been convicted under a law that punished communicating with officials in a government agency, in connection with a matter before that agency, on behalf of another person, within one year of leaving employment at that agency. The defendant successfully contended that Congress meant to require a showing that he had knowledge of the specific circumstances making his communication unlawful. *See also United States v. Harris,* 959 F.2d 246, 259–60 (D.C.Cir.) (since legal meaning of "firearm" under 26 U.S.C. § 5861(d) is obscure and "defendant is not necessarily someone who has already been proven to have engaged knowingly in criminal behavior with the very gun in question," defendant must have knowledge that he possesses "firearm" within meaning of statute), *cert. denied,* —— U.S. ——, 113 S.Ct. 362, 121 L.Ed.2d· 275 (1992); *United States v. Anderson,* 885 F.2d 1248 (5th Cir. 1989) *(en banc )* (same holding with respect to 26 U.S.C. § 5861(d), partly on ground that it would be possible, in the absence of a knowledge requirement, to "innocently possess" a "firearm" within the meaning of the law and still be convicted); *United States v. Williams,* 872 F.2d 773 (6th Cir.1989) (same holding with respect to 26 U.S.C. § 5861(e)).

The cases reveal a lack of guidance from any recent fully considered Supreme Court elucidations of the *mens rea* principle. Culpability doctrines, especially in their more sophisticated modern forms, do far more than simply separate the innocent from the guilty. They mediate between the individual and society, ensuring that a complex web of legal commands operates effectively and in a properly nuanced fashion. They are essential to the rational and ordered operation of the criminal law. Leaving aside for the moment the commands of just and equal treatment under the law, it makes no criminal

policy sense to treat the person who has crossed some magical unknown threshold of "criminality" or "wrongdoing" differently from the person who has not.

### B. *Sentencing Context* ·

.The operation of the *mens rea* principle takes on a special character. at the sentencing stage. Because most theoretical and doctrinal analysis of problems of mental states has focused on the conviction stage, one might assume that concerns about the *mens rea* principle fall away once a finding of guilt has attached. In fact, the opposite is true.

### 1. General Principles

The Supreme Court has long recognized the importance of individualized treatment of offenders at the highly discretionary sentencing phase of criminal proceedings. If Anglo–American legal traditions insist that guilt of crime is personal, they require even more so that punishment for crime be personal. The Court summarized the sentencing process in *Williams v. New York,* 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949):

> Tribunals passing on the guilt ·of· a defendant have always been hedged in· by strict evidentiary procedural limitations. But both before and since the American colonies became a nation, courts in this country and in England practiced a policy under which a sentencing judge could exercise ·wide discretion in the sources and types of evidence used to assist him in determining the kind and extent of punishment to be imposed within limits fixed by law....

> Highly relevant—if not essential—to his selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics.

*Id.* at 246–47, 69 S.Ct. at 1082–83. Despite the many significant changes that have occurred in sentencing practice since *Williams,* the Court adheres to this fundamental understanding of the sentencing process. Just this term the Court stated, "Traditionally, sentencing judges have considered a wide variety of factors in addition to evidence bearing on guilt in determining what sentence to

impose on a convicted defendant." *Wisconsin v. Mitchell*, —— U.S. ——, 113 S.Ct. 2194, 124 L.Ed.2d 436 (1993). The Court cited its previous observation in *Tison v. Arizona*, 481 U.S. 137, 156, 107 S.Ct. 1676, 1687, 95 L.Ed.2d 127 (1987), that "[d]eeply ingrained in our legal tradition is the idea that the more purposeful is the criminal conduct, the more serious is the offense, and, therefore, the more severely it ought to be punished."

Leeway and discretion at sentencing apply to both mitigating and aggravating factors. Just as the sentencing judge can and should consider a wide range of factors in imposing sentence, legislatures have considerable freedom in dictating what facts bear upon sentencing. In an opinion written before the advent of the Sentencing Guidelines, the Supreme Court explained the extent of legislative freedom in this regard. *McMillan v. Pennsylvania*, 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986).

At issue in *McMillan* was a Pennsylvania statute providing that the trial judge must impose a sentence of at least five years imprisonment if any person convicted of a felony enumerated in the law is found, by a preponderance of the evidence, to have "visibly possessed a firearm" during the commission of the offense. The Court rejected the defendant's contention that the statute impermissibly circumvented the constitutional requirement of proof beyond a reasonable doubt by, in effect, relegating a finding of guilt to the sentencing phase. The Court focused on the fact that the statute did not have the effect of expanding the maximum sentence for any of the enumerated felonies, but only confined the sentencing judge's discretion. *Id.* at 88, 106 S.Ct. at 2417. The Court characterized the law as follows: "[The legislature] simply took one factor that has always been considered by sentencing courts to bear upon punishment—the instrumentality used in committing a violent felony—and dictated the precise weight to be given that factor if the instrumentality is a firearm." *Id.* at 89–90, 106 S.Ct. at 2417–18. The Court also pointed out, however, that "[t]he statute gives no impression of having been tailored to permit the visible possession finding to be a tail which wags the dog of the substantive offense." *Id.* at 88, 106 S.Ct. at

2417. It concluded by finding that the preponderance-of-the-evidence standard was a sufficiently stringent burden of proof in this context on the ground that sentencing courts "have traditionally heard evidence and found facts without any prescribed burden of proof at all." *Id.* at 91, 106 S.Ct. at 2418.

The Court is both respectful of the Anglo–American tradition of judicial discretion in sentencing and willing to permit (and, in the death penalty context, require) considerable legislative control of that discretion. Implicit in the *McMillan* Court's statement that the tail may eventually wag the dog, however, is a recognition of the continued importance of the distinction between the determination of guilt and the imposition of punishment. It would offend fundamental conceptions of fair process for a legislature to import essential determinations of guilt or innocence into the sentencing stage. *Cf. In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). Our belief that guilt is personal would be fatally undermined either by deprivation of the beyond-a-reasonable-doubt standard and the protections of jury trial or by deprivation of an individualized determination of blameworthiness at the punishment phase. *See* Note, Winship *on Rough Waters: The Erosion of the Reasonable Doubt Standard*, 106 Harv.L.Rev. 1093, 1100–02 (1993) (arguing that *McMillan* weakens the beyond-a-reasonable-doubt standard by allowing substantive determinations to be made at the sentencing stage).

## 2. Effect of Guidelines

In the federal courts, the Guidelines have dramatically altered the sentencing process. *See Burns v. United States*, —— U.S. ——, ——, 111 S.Ct. 2182, 2184, 115 L.Ed.2d 123 (1991) ("The Sentencing Reform Act of 1984 revolutionized the manner in which district courts sentence persons convicted of federal crimes."); *see generally Mistretta v. United States*, 488 U.S. 361, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989) (describing duties, powers and acts of United States Sentencing Commission and effect of Guidelines). The Anglo–American tradition of individualized sentencing is under great pressure from a system that has *both* deprived sentencing

judges of much of their discretion *and* imported many questions traditionally handled at the conviction stage into the sentencing process. Under the regime of the Guidelines, we confront many situations in which the sentencing tail increasingly can be seen to be wagging the guilt-innocence dog.

Constitutional and other attacks on the Guidelines system as a whole have so far been turned aside. *See, e.g., Mistretta,* 488 U.S. 361, 109 S.Ct. 647 (rejecting separation of powers challenge to Sentencing Commission); *but see United States v. Spencer,* 817 F.Supp. 176 (D.D.C.1993) (holding "career offender" provision of Guidelines, which mandated sentence of thirty years, unconstitutional on proportionality grounds as applied to young offender with three prior convictions who possessed seven and one-half grams of cocaine base). The federal courts, however, have increasingly begun to recognize the tendency of the Guidelines in certain contexts to upset the delicate balance between the conviction and sentencing phases of the criminal process. *See United States v. Restrepo,* 946 F.2d 654, 678 (9th Cir.1991) (Norris, J., dissenting) ("There are signs ... that the dam is finally cracking, signs of an emerging awareness of the truly profound implications of the changes the Guidelines have wrought."), *cert. denied,* —— U.S. ——, 112 S.Ct. 1564, 118 L.Ed.2d 211 (1992).

While dissenting from the Court's ruling in *Burns* that advance notice must be provided to a defendant of the district court's intention to depart upward from the Guidelines, Justice Souter, joined by two other Justices, maintained that

> a defendant enjoys an expectation subject to due process protection that he will receive a sentence within the presumptively applicable [Guidelines] range in the absence of grounds defined by the [Sentencing Reform] Act as justifying departure.

*Burns,* —— U.S. at ——, 111 S.Ct. at 2192 (Souter, J., dissenting). Justice Souter's position reflects an appreciation of the extent to which due process protections, which have always accompanied the defendant through sentencing, *id.* at ——, 111 S.Ct. at 2191 (Souter, J., dissenting), must particularly be enforced now that the sentencing phase has

so much greater an impact. *See also Restrepo,* 946 F.2d at 664–79 (Norris, J., dissenting) (liberty interest in sentence within Guidelines range means that due process requires higher burden of proof than preponderance of the evidence). The power of the Sentencing Commission and the Guidelines to determine a defendant's fate, without regard to the discretion of the sentencing judge, has been enhanced even further by the Court's recent ruling that "commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *Stinson v. United States,* —— U.S. ——, ——, 113 S.Ct. 1913, 1915, 123 L.Ed.2d 598 (1993).

A recent case addressed by the Court of Appeals for the Second Circuit illustrates the sometimes perverse effect of the Guidelines on the sentencing process. One of three defendants in *United States v. Concepcion,* 983 F.2d 369 (2d Cir.1992), Nelson Frias, was acquitted on two narcotics-related counts and convicted on two firearms-related counts. At sentencing, Frias' offense level for these firearms counts was hugely enhanced because the Guidelines dictated that the narcotics-related character of the offenses be taken into account. His Guideline range was calculated at 262 to 327 months. He could be sentenced to only 240 months because the statutory maximum for each firearms count was 10 years. Had his sentence been calculated based solely upon the conduct for which he was convicted, the Guidelines range would have been 12 to 18 months.

After a careful analysis of the applicable provisions, the court of appeals concluded that the trial court had applied the Guidelines correctly. *Id.* at 386–88. The most the appellate court could say was that the Sentencing Commission might not have envisioned such an "astronomical" increase in sentence and, therefore, the trial court should have considered the possibility of a downward departure. *Id.* at 389. Judge Newman wrote a concurring opinion in which he stated,

> The sentencing of Nelson Frias is a stark example of the bizarre results that occa-

sionally occur from a combination of the Sentencing Guidelines and the sentencing jurisprudence that was developed prior to the Guidelines and is now applied to the Guidelines regime....

[A]fter he was tried for the conspiracy offense and acquitted, he faces virtually the same sentence that he would have received had he been convicted! His twenty-year sentence is thirteen times higher than the top of the guideline range that would have been applicable had he been sentenced solely for the conduct of which he was convicted. When the Guidelines and the case law implementing them permit such a result, it is high time for both the Commission and the courts to give serious reconsideration to the decisions that underlie this outcome.

*Id.* at 393–95. Judge Newman provided a lucid explanation of how the Guidelines' equating of "relevant conduct" with convicted conduct and the pre-Guidelines rules concerning burden-of-proof and other procedures at sentencing combine to produce such "bizarre results." *Id.*

The court of appeals denied Frias' petition for rehearing *en banc.* Judge Newman dissented, writing, "In some way, the law must be modified." *Id.* at 395–96; *see also United States v. Alaga,* 995 F.2d 380 (2d Cir.1993) (illustrating, in "reverse buy" narcotics cases, the extent to which puffery during negotiations can permit government to inflate quantity with which defendant will be charged, without regard to defendant's ability to consummate the transaction, thereby greatly enhancing the sentence); *United States v. McCormick,* 992 F.2d 437 (2d Cir.1993) (finding no violation of double jeopardy clause in prosecuting defendant in one district for conduct that was previously used in another district to enhance punishment under the Guidelines).

The Courts of Appeals for the Third and Ninth Circuits have sought to place some limitations on the tendency of the Guidelines to subvert the conviction stage of criminal proceedings. In *United States v. Kikumura,* 918 F.2d 1084 (3d Cir.1990), the Court of Appeals for the Third Circuit found that, under *McMillan,* the sentencing tail had

wagged the conviction dog. The Guidelines range for the charged explosives and passport offenses was 27 to 33 months imprisonment. Evidence produced at the sentencing hearing established that Kikumura had made three bombs and was planning a major terrorist attack. The court sentenced him to thirty years imprisonment. The court of appeals observed,

> Though long recognized as a practical necessity, real offense sentencing can create the potential for significant unfairness. This is so because every factual consideration deemed relevant for sentencing purposes must be established through a collateral, post-verdict adjudication at which the applicable procedural protections are significantly lower than those applicable to the trial itself.

*Id.* 918 F.2d at 1099. The court acknowledged that the preponderance-of-the-evidence standard generally was appropriate to sentencing determinations. But it went on to state,

> Here, however, we are dealing with findings that would increase Kikumura's sentence from about 30 months to 30 *years*— the equivalent of a 22–level increase in his offense level. This is perhaps the most dramatic example imaginable of a sentencing hearing that functions as 'a tail which wags the dog of the substantive offense.' In this extreme context, we believe, a court cannot reflexively apply the truncated procedures that are perfectly adequate for all of the more mundane, familiar sentencing determinations.

*Id.* at 1100–01 (emphasis in original) (citations omitted) (quoting *McMillan,* 477 U.S. at 88, 106 S.Ct. at 2417). The court held that the factfinding underlying the departure in a case such as Kikumura's must be made at least by clear and convincing evidence. *Id.* 918 F.2d at 1101. The court, for the same reasons, also required imposition of a higher standard than is ordinarily applied at sentencing to the admissibility of the hearsay statements of a confidential informant. *Id.* at 1102–03.

The *Kikumura* court's holding was a limited one, but its lengthy and thoughtful opinion indicated a keen appreciation of the impor-

tance of protecting the traditional balance between the conviction and sentencing phases against the tendency of the Guidelines to upset that balance. Perhaps the flip side of *Kikumura* is a recent decision by the same court of appeals in which a trial judge was reversed for failing to consider the possibility of a downward departure in a case in which the defendant was solely able to care for his mentally ill wife. *United States v. Gaskill,* 991 F.2d 82 (3d Cir.1993). The court of appeals disagreed with the trial judge's conclusion that he lacked authority to depart on this compassionate ground.

The Court of Appeals for the Ninth Circuit has declined to acquiesce in the view of the Court of Appeals for the Second ·Circuit in *Concepcion.* The defendant in *United States v. Brady,* 928 F.2d 844 (9th Cir.1991), was charged with first degree murder and assault with intent to commit murder, but was convicted of the lesser included offenses of voluntary manslaughter and assault with a dangerous weapon. At sentencing, the trial court departed upward from the Guidelines range, in part based upon its evaluation of the defendant's "state of mind, and the degree of planning and preparation of [the] offenses." *Id.* at 850. The court of appeals agreed with the defendant's contention that this finding in effect punished him for conduct of which the jury had acquitted him, stating that it "would pervert our system of justice if we allowed a defendant to suffer punishment for a criminal charge for which he or she was acquitted." *Id.* at 851. The court, taking a pragmatic view of sentencing, refused to accept the facile contention that the defendant was not punished any more than the law allowed:

> True, the sentence is ultimately capped by the statutory maximum of the offense for which the defendant was convicted. Yet the maximum sentences prescribed by the statutes were formulated in a time when a defendant was eligible for parole after serving one-third of his or her sentence less good time. There is no such possibility of early release under the Guidelines.

*Id.* at 852; *compare Restrepo,* 946 F.2d at 665 (Norris, J., dissenting) ("The Guidelines provide us with a sentencing scheme that seems to be unprecedented in that it not only treats elements of a crime as sentencing factors, but also attaches mandatory penal consequences to proof of those facts.") *and United States v. Mobley,* 956 F.2d 450, 461 (3d Cir.1992) (Mansmann, J., dissenting) ("[I]n certain situations the Guidelines provide the government a convenient detour around fundamental constitutional protections afforded an accused before conviction.") *with Mobley,* 956 F.2d at 455 ("The Guidelines ... do not differ analytically from the Pennsylvania statute in *McMillan* for the purpose of ... due process scrutiny.") *and United States v. Guerra,* 888 F.2d 247, 250 (2d Cir.1989) ("We can discern no significant difference between disputes about pre-Guidelines sentencing factors under *McMillan* and those concerning 'relevant conduct' pursuant to the Guidelines."), *cert. denied,* 494 U.S. 1090, 110 S.Ct. 1833, 108 L.Ed.2d 961 (1990).

The dramatic increase in the importance of the sentencing phase in relation to the conviction stage has caused many trial judges, at least in the Second Circuit, to adopt a sliding-scale burden of proof analysis at sentencing under which determinations of greater consequence are made pursuant to standards that are higher than a preponderance of the evidence, and sometimes as high as beyond a reasonable doubt. *See* Note, 66 S.Cal.L.Rev. 357, 360–63 (1992) (reporting results of survey of trial judges in Second Circuit); *see also* Jonathan M. Moses, *Many Judges Skirt Sentencing Guidelines,* Wall St.J., May 7, 1993, at B12 (reporting "low-key rebellion" by many trial judges against Guidelines). This is in spite of the court of appeals' ruling that the preponderance-of-the-evidence standard satisfies due process under the Guidelines. *Guerra,* 888 F.2d at 251. Such realistic approaches, while perhaps commendable under the circumstances, are poor substitutes for candid treatment of the many constitutional difficulties created by the operation of the Guidelines. *See Kikumura,* 918 F.2d at 1100 ("[A]n appropriate level of procedural protection cannot be calibrated on a sliding-scale, case-by-case basis.").

This increasing concern with the dramatic effect of the Guidelines in permitting, in effect, bypassing of the conviction stage, going

directly to the sentencing stage has not as yet been evaluated in the context of the *mens rea* principle. In *United States v. Burke*, 888 F.2d 862 (D.C.Cir.1989), for example, the district court added two levels to the calculation of a sentence in a narcotics case, pursuant to Guidelines § 2D1.1(b), because the defendant had a firearm in a tote bag when the offense was committed. The defendant contended that the sentencing judge had to find that he knew he was in possession of the weapon. The court of appeals agreed. The court's ruling had three bases: 1) a since-repealed provision in the "general application principles" of the Guidelines, *see* Guidelines § 1B1.3, stating that the defendant's state of mind should be taken into account; 2) the rule of statutory construction holding that ambiguities should be resolved in favor of criminal defendants; and 3) "the presumption against strict liability." *Id.* at 866. The court adopted a standard under which the government would be permitted to prove that the defendant was "reckless or criminally negligent" with respect to his awareness of the firearm possession. *Id.* at 868.

*Burke*, however, was effectively overruled by *United States v. Taylor*, 937 F.2d 676 (D.C.Cir.1991). In the interim between the two decisions, the Sentencing Commission had removed the "mental state" provision from the "general application principles" of Guidelines § 1B1.3. This change of view of the Commission was sufficient to persuade the court that, in an illegal firearm possession case, knowledge of the gun's status as stolen is not required for a two-level enhancement under Guidelines § 2K2.1.

The Court of Appeals for the Fifth Circuit agreed with *Taylor* in *United States v. Singleton*, 946 F.2d 23 (5th Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 1231, 117 L.Ed.2d 465 (1992), holding that knowledge of a gun's status as stolen is not required under § 2K2.1 since the "guidelines drafters have been explicit when they wished to import a *mens rea* requirement." *Id.* 946 F.2d at 25. The court turned back the defendant's constitutional claim on the ground that "the Supreme Court's [*mens rea*] holdings [do not] support the proposition that intent must be proved for each element a judge considers

in sentencing." *Id.* at 26. "Because this upward adjustment occurs during sentencing, when district court discretionary authority is especially broad, this adjustment does not offend due process." *Id.* at 27. This analysis is typical of the widespread failure of courts to appreciate the impact of the Guidelines. It is one thing to say that the sentencing judge may, and traditionally has, considered a wide array of factors at sentencing without regard to *mens rea.* It is quite another thing to say—as the Guidelines in effect say—that the sentencing judge *must* enhance a particular defendant's sentence for a particular reason without regard to *mens rea.* A tradition of discretion cannot be invoked to justify a practice of removing discretion.

Similarly, in *United States v. Schnell*, 982 F.2d 216 (7th Cir.1992), the Court of Appeals for the Seventh Circuit held that the absence of a scienter requirement in the Guidelines enhancement for possession of a firearm with an obliterated serial number did not violate due process. The defendant, a previously convicted felon, had been convicted of illegally possessing a firearm. The court's holding was based largely on the ground that "a felon who obtains a gun is not engaging in 'apparently innocent conduct,' whether or not he knows that the gun is stolen or altered." *Id.* at 221 (quoting *Liparota v. United States*, 471 U.S. 419, 426, 105 S.Ct. 2084, 2088, 85 L.Ed.2d 434 (1985)).

These sentencing opinions, like their counterparts dealing with the *mens rea* principle in the context of the conviction stage, fail to give adequate weight to the subtlety of the principle's operation. They generally proceed on the theory that once an individual is determined to be any sort of criminal, he or she should be punished for everything done. Such an approach misses the fundamental Anglo-American legal understanding that two individuals can commit the same act under very different circumstances. It attributes to policymakers—whether they be members of Congress or of the Sentencing Commission—a purely retributive desire to see the fullest sanctions of the criminal law imposed without regard to individual blameworthiness. The federal courts appear to be

gradually substituting a new theory of criminal liability based upon "wrongful conduct" that is unprecedented and runs against the great weight of legal authority and traditional practice.

The attempt of the Court of Appeals for the Third Circuit to address this argument is not fully satisfying. In *United States v. Mobley*, 956 F.2d 450 (3d Cir.1992), the court rejected a claim that, for reasons of both statutory interpretation and constitutional law, the stolen-gun enhancement of Guidelines § 2K2.1 must include a knowledge requirement. In addressing the statutory claim, the court stated,

> [The enhancement] is not in discord with the purposes of the Guidelines because the Guidelines are essentially offense-based and, as such, philosophically justified by a retributivist and, to a lesser extent, a deterrence theory of penology. [The defendant's] contentions fail, for the enhancement is rationally related to both theories and functions as a regulatory component in Congress' scheme to control the gun trade.

*Id.* at 453; *see also id.* at 459 (rejecting constitutional claim on ground that "a six months increase is hardly the stuff of due process violation that the *McMillan* Court had in mind with its canine metaphor"). It is difficult to see the deterrence value in punishing aggravating circumstances of which a defendant was not aware since he could not have corrected his conduct in deference to the criminal law. Congress may "regulate" firearms in many ways but criminal laws carrying lengthy terms of imprisonment cannot fairly be characterized as mere "regulations" to protect "the public welfare." *See, e.g.*, 18 U.S.C. §§ 924(c)(1) (mandatory additional sentence of five years imprisonment or more for using or carrying firearm during and in relation to a crime of violence or drug trafficking) and 924(e)(1) (minimum sentence of 15 years imprisonment for receipt of firearm by person with three previous convictions for violent felonies or drug offenses). Only harsh retributive aims of an archaic law are served by the abandonment of *mens rea* in this context.

## C. *Mistake in Narcotics Cases*

With the background of the *mens rea* principle and the law of sentencing established, it is now possible to address and apply the law bearing on the question presented in these cases: how should a defendant's mistake of fact concerning the type of narcotics smuggled be treated at the sentencing phase?

### 1. Applicable Law

#### a. Statutes

The offense to which these defendants pled guilty is defined as follows:

> It shall be unlawful ... to import into the United States from any place outside thereof, any controlled substance in schedule I or II of subchapter I of this chapter, or any narcotic drug in schedule III, IV, or V of subchapter I of this chapter....

21 U.S.C. § 952(a). Both cocaine and heroin fall within this provision. *See* 21 U.S.C. §§ 812, Schedule I (defining heroin as schedule I controlled substance) and 812, Schedule II (defining cocaine as schedule II controlled substance). The penalties for violations of § 952(a) are set out in 21 U.S.C. § 960(b). The statute erects a hierarchy of penalties based upon the quantity of the narcotics smuggled. For a violation involving heroin, for example, a kilogram or more carries a sentence of at least 10 years in prison and up to life, *id.* § 960(b)(1)(A); 100 grams or more carries a sentence of at least five years in prison and up to 40 years, *id.* § 960(b)(2)(A); and all other amounts carry a sentence of zero to 20 years imprisonment, *id.* § 960(b)(3). Larger quantities of cocaine are necessary to trigger each of these statutory terms of imprisonment. *See id.* §§ 960(b)(1)(B) (10–year minimum for five kilograms or more) and 960(b)(2)(B) (five-year minimum for 500 grams or more). The statute also carries greater penalties for offenses involving death or serious injury and for offenders who have previous narcotics convictions.

It is settled law in the Second Circuit that the penalty provisions in the statutes within Title 21 prohibiting possession, distribution and smuggling of narcotics are not elements of the substantive offenses. The penalty statutes are relevant only at

sentencing. With respect to the statute prohibiting possession of narcotics with intent to distribute, the court of appeals has explained,

> Section 841(a) of Title 21 prohibits distribution of *any* [emphasis in original] amount of [heroin] and in no way requires proof of a particular quantity of narcotics as an element of the [offense]. When an indictment does allege that a particular quantity is involved, the effect is only to put the·defendant on notice that the enhanced penalty provisions of Section 841(b) .*may* apply [emphasis supplied]. Because the quantity is relevant only to enhancement of·the sentence, the government is not required to prove [to the jury] the quantity alleged....

*United States v. Campuzano*, 905 F.2d 677, 679 (2d Cir.), *cert. denied*, 498 U.S. 947, 111 S.Ct. 363, 112 L.Ed.2d 326 (1990). The amount of the drugs is not, the cases hold, an essential element of the offense of possession with intent to distribute and the issue does not go to the jury. *See United States v. Moore*, 968 F.2d 216, 224 (2d Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 480, 121 L.Ed.2d 385 (1992) (lack of specific finding by jury of quantity involved is irrelevant since quantity is solely for sentencing judge).

▪ Because quantity has been held to be a nonessential element of the § 841(a) offense, a defendant does not plead to a quantity of drugs when he or she pleads guilty to violating that statute. *See Hayle v. United States*, 815 F.2d 879, 881 (2d Cir.1987) ("It is well settled that a defendant's plea of guilty admits all of the elements of a formal criminal charge...."); *LaMagna v. United States*, 646 F.2d 775, 778 (2d Cir.) (same), *cert. denied*, 454 U.S. 898, 102 S.Ct. 399, 70 L.Ed.2d 214 (1981); *see also People v. Olah*, 300 N.Y. 96, 98–100, 89 N.E.2d 329 (1949) ("[T]he crime, i.e., the operative facts which constitute the criminal offense as defined by the statute, cannot be extended or enlarged by allegations in the indictment or by evidence at the trial.").·

▪ These cases do not explain whether Congress intended that the defendant's mental state be taken into account in some fashion when determining precisely where on the statute's penalty ladder that particular defendant belongs. A defendant's knowledge that the substance imported is *some* type of narcotic—regardless of either quantity or type—clearly suffices for conviction under § 952. When it comes to the sentencing phase, however, the trial court must still determine whether the defendant's knowledge is relevant in applying the penalty provisions of the statute. *See United States v. Ekwunoh*, 813 F.Supp. 168 (E.D.N.Y.1993) (treating problem of mental state with respect to quantity at sentencing phase in narcotics conspiracy cases).

The legislative history of the drug importation laws offers little guidance. . The prohibition on narcotics importation was first adopted in its current form as part of the Comprehensive Drug Abuse Prevention and Control·Act of 1970, Pub.L. No. 91–513, 84 Stat. 1236, 1285 (1970). The penalty for importation of a schedule I or II controlled substance by a first-time offender was zero to 15 years imprisonment and up to a $25,000 fine. Pub.L. No. 91–513, § 1010, 84 Stat. at 1290 (1970). The principal purpose of the 1970 Act was

> to deal in a comprehensive fashion with the growing menace of drug abuse in the United States (1) through providing authority for increased efforts in drug abuse prevention and rehabilitation of users, (2) through providing more effective means for law enforcement aspects of drug abuse prevention and control, and (3) by providing for an overall balanced scheme of criminal penalties for offenses involving drugs.

H.R.Rep. No. 91–1444, 91st Cong., 2d Sess., *reprinted in* 1970 U.S.C.C.A.N. 4566, 4567. Congress' intention was to eliminate a "plethora of legislation [that] has necessarily given rise to a confusing and often duplicative approach to control of the legitimate industry and to enforcement against the illicit drug traffic." *Id.* at 4571. The 1970 law heavily emphasized rehabilitation of drug abusers and "sentencing provisions generally [were] left to the discretion of the courts." *Id.* at 4574. The narcotics statutes were simplified and practically all mandatory minimum sentences were eliminated. *Id.* at 4570. The House Report stated:

The severity of existing penalties, involving in many instances mandatory minimum sentences, have led in many instances to reluctance on the part of prosecutors to prosecute some violations, where the penalties seem to be out of line with the seriousness of the offense.... The committee feels, therefore, that making the penalty structure in the law more flexible can actually serve to have a more deterrent effect than existing penalties, through eliminating some of the difficulties prosecutors and courts have had in the past arising out of mandatory minimum sentences.

*Id.* at 4576.

The penalty provisions of the drug importation laws were not significantly amended until 1984. *See* Controlled Substances Penalties Amendments Act of 1984, Pub.L. No. 98–473, § 504, 98 Stat. 2068 (1984). For the first time Congress differentiated offenses based upon quantity by providing stiffer penalties for offenses involving narcotics over specified weights. *See* H.R.Rep. 98–1030, 98th Cong., 2d Sess. 255, *reprinted in* 1984 U.S.C.C.A.N. 3182, 3437. The maximum penalties for first-time offenders were increased to twenty years for large amounts of narcotics. Mandatory minimum sentences were not adopted.

The present detailed mandatory minimum sentence provisions and overall quantity-based penalty scheme was enacted with the adoption of the Anti–Drug Abuse Act of 1986, Pub.L. No. 99–570, § 1302, 100 Stat. 3207–15 (1986). The only substantial official explanation provided by Congress for these amendments can be found in the House Report:

One of the major goals of this bill is to give greater direction to the DEA and the U.S. Attorneys on how to focus scarce law enforcement resources. Up until 1984 the controlled substances law did not distinguish drug traffickers by the quantities of drugs they were responsible for selling or smuggling.... The Committee strongly believes that the Federal government's most intense focus ought to be on major traffickers, the manufacturers or the heads of organizations, who are responsible for creating and delivering very large quantities of drugs.

*See* H.R.Rep. 99–845, 99th Cong., 2d Sess. 11–12 (1986).

Congress has not expressed its view with respect to the role of a defendant's mental state in the application of the penalty provisions of the federal narcotics laws. But the legislative history does make clear a consistent trend in the direction of increasing differentiation among narcotics offenders based upon their perceived dangerousness. All narcotics offenders are no longer treated alike. Dangerousness has come to be defined largely by reference to the type and the quantity of the drugs involved. Congress has developed an increasingly nuanced hierarchy of punishment keyed to the specific characteristics of the crime involved. The scheme is essentially keyed to weight, though some substances are treated as more serious per gram than others.

b. Guidelines

The Sentencing Commission has followed the lead of Congress and adopted a similar but far more elaborate penalty hierarchy based upon the type and the quantity of the drugs involved. Within the relatively few statutory categories established by Congress lie nearly 20 distinct categories promulgated by the Commission. Guidelines § 2D1.1(a)(3) dictates that, unless death or serious bodily injury results, the base offense level for offenses involving drugs is to be determined by reference to the "Drug Quantity Table" contained in Guidelines § 2D1.1(c). Pursuant to this table, the base offense level increases in increments of two as the quantity of the drugs rises. As the table rises from the lower to the higher offense levels, increasingly greater increments of quantity are required to cross each succeeding threshold. Heroin is punished more severely per gram than is cocaine.

In its Commentary to Guidelines § 2D1.1, the Commission explains how it derived its approach from the statutes:

The base offense levels in § 2D1.1 are either provided directly by the Anti–Drug Abuse Act of 1986 or are proportional to the levels established by statute, and apply

to all unlawful trafficking. Levels 32 and 36 in the Drug Quantity Table are the distinctions provided by the Anti–Drug Abuse Act; however, further refinement of drug amounts is essential to provide a logical sentencing structure for drug offenses. To determine these finer distinctions, the Commission consulted numerous experts and practitioners, including authorities at the Drug Enforcement Administration, chemists, attorneys, probation officers, and members of the Organized Crime Drug Enforcement Task Force, who also advocate the necessity of these distinctions.

Guidelines § 2D1.1 Commentary. Nothing in the brief commentary to § 2D1.1 treats the problem of the defendant's mental state. As discussed above, prior to November 1, 1989 the general Guideline on relevant conduct, § 1B1.3, included a provision stating that the court should take into account "the defendant's state of mind, intent, motive and purpose in committing the offense." See U.S.S.C., Guidelines Manual (1992), Appendix C, Amendment 76. As already noted, this provision was deleted from § 1B1.3 with no explanation other than that it was "unnecessary." Id.

Whatever force the Commission's commentary may have, see Stinson v. United States, — U.S. —, 113 S.Ct.1913, 123 L.Ed.2d 598 (1993), the mere omission of a less-than-clear general provision, where no explanation is provided for its removal, cannot be said to be controlling. Even if such an act by the Commission did have some authoritative force, it could not be construed so as to contravene the Constitution, a statute or the Guidelines themselves. See Stinson, — U.S. at —, 113 S.Ct. at 1915.

### c. Second Circuit Cases

The Court of Appeals for the Second Circuit has addressed a series of cases that presented mens rea issues similar to the one faced in these cases. It has not, however, had to confront squarely the issue presented here: how the trial court should properly treat a defendant's mens rea with respect to drug type at the sentencing phase. And when it has discussed similar problems, it has not engaged in the kind of detailed analysis of the mens rea principle necessary to answer the question posed in the instant cases.

In United States v. Falu, 776 F.2d 46 (2d Cir.1985), the defendant was convicted of distributing heroin within 1000 feet of a school. The government did not introduce any evidence to show that the defendant knew he was within 1000 feet of a school. The defendant argued that, without a knowledge requirement, the statute failed to provide him with fair notice that he would be subject to its enhanced penalties. The court of appeals ruled that "a requirement that the dealer know that a sale is geographically within the prohibited area would undercut [Congress'] unambiguous legislative design" to deter drug distribution in and around schools. Id. at 50. The court further justified its holding with the observation that

the schoolyard statute resembles other federal criminal laws, which provide enhanced penalties or allow conviction for obviously antisocial conduct upon proof of a fact of which the defendant need not be aware.

Id. Congress' deterrence objective would be advanced, the court argued, by placing the burden upon drug dealers "of ascertaining where schools are located and removing their operations from those areas or else face enhanced penalties." Id.

In United States v. Collado–Gomez, 834 F.2d 280 (2d Cir.1987), cert. denied, 485 U.S. 969, 108 S.Ct. 1244, 99 L.Ed.2d 442 (1988), the court, in a brief per curiam opinion, relied primarily upon Falu in ruling that

the government does not have to prove that the defendant knew the specific nature and amount of the controlled substance for the enhancement provisions [of the penalty provisions of the narcotics laws] to apply.

Id. 834 F.2d at 280–81. The court again relied on the observation that dispensing with a mens rea requirement in the case at hand would not "criminalize otherwise innocent activity." Id. at 281.

Just as those who possess drugs for sale must bear the risk of determining how close to a school they are, such dealers

must bear the risk of knowing what drugs they are dealing under the 1986 amendments.

*Id.* The court was dealing, in *Collado–Gomez,* with the statutory penalty provisions and not—as in the instant cases—with the Guidelines. It relied upon *Falu*—a case about substantive liability under an independent statutory provision—without mentioning the possibility of a distinction between the conviction and sentencing phases of the criminal process. *See also United States v. Pineda,* 847 F.2d 64 (2d Cir.1988) (*per curiam*) (rejecting as "frivolous" in light of *Collado–Gomez* a due process challenge, based in part on *mens rea* contentions, to the enhanced penalty provisions of 21 U.S.C. § 841(b)).

The court of appeals has once addressed the issue of knowledge in narcotics cases in the context of the Guidelines. It did so in a *per curiam* opinion, slightly over one-half of a page in length, that provides little guidance to the factual basis in the trial court record it relied upon. *United States v. Obi,* 947 F.2d 1031 (2d Cir.1991). The defendant, a Nigerian man, pled guilty to one count of importation of heroin. Since importers from Nigeria, this court judicially notices, invariably carry heroin, any claim that the defendant thought he was carrying cocaine would generally be considered frivolous. The trial court calculated his base offense level on the basis of the heroin he actually imported. The defendant contended at his sentencing and on appeal that he believed he was importing cocaine and, therefore, his base offense level should have been calculated with reference to cocaine. The trial judge rejected the defendant's contention, though the court of appeals' opinion does not explain whether it assumed this was on ground of fact or law. Again relying on *Falu,* the court of appeals ruled that the district court had properly calculated the defendant's base offense level. *Id.* 947 F.2d at 1032. The court stated,

> [T]he *mens rea* requirement concerning the possession of a controlled substance satisfies due process concerns and ... Congress, for purposes of deterrence, intended that narcotics violators run the risk of sentencing enhancements concerning other circumstances surrounding the crime.

*Id.*

None of these opinions directly controls the issue now before this court. *Obi* is the closest the court of appeals has come to stating the role of the defendant's mental state with respect to drug type at sentencing. But the *Obi* court only affirmed a trial judge's base-offense-level calculation without indicating whether the defendant's claim had been found to be credible by the trial judge in the exercise of his fact-finding obligations at sentencing. *See United States v. Shonubi,* 998 F.2d 84, 86 (2d Cir.1993) ("[T]he state of a defendant's mind, his *mens rea,* is always a matter for the trial court to determine."). Unlike the *Obi* and arguably related cases considered to date by the court of appeals the present cases and records present the *mens rea* issue in a way that must be met head-on. Moreover, it must be emphasized that in each of these cases, the court relied almost exclusively on Congress' deterrence objectives to dismiss the importance of the *mens rea* principle without considering the integral role that principle plays in the rational operation of a carefully constructed criminal code that has deterrence as a primary objective. *See* 18 U.S.C. § 3553 ("The court shall impose a sentence sufficient, but not greater than necessary ... to afford adequate deterrence to criminal conduct....").

## 2. Burden-of-Proof Structure

A procedural mechanism is readily available which harmonizes and gives full weight to the relevant influences operating in this case, including the Constitution, Congress, the Sentencing Commission, the courts of appeals and Supreme Court decisions, the needs of law enforcement, the rights of criminal defendants and the general traditions of the Anglo–American criminal law.

In sentencing a defendant who has been convicted of narcotics importation, the district judge should presume that the defendant was aware of the type of narcotics he or she carried. The government is not required, at either the conviction or the sen-

tencing phases, to prove that the defendant knew the specific type of narcotics involved. A showing that the defendant knew the substance carried was some type of prohibited drug usually will fulfill the government's obligations with respect to the defendant's mental state.

▋ The defendant, however, must be afforded the opportunity to rebut this presumption by introducing evidence at the sentencing phase that he or she believed the drugs to be of a different type than they in fact were. *Cf. United States v. Jessup*, 757 F.2d 378 (1st Cir.1985) (presumption of flight under Bail Reform Act rebuttable).. The burden would then be on the government to establish *mens rea. Cf. United States v. Shonubi*, 998 F.2d 84, 90 (2d Cir.1993) (in sentencing drug importer who made numerous trips, burden is on government to prove quantity of drugs involved in each trip). As Chief Judge Breyer pointed out in *Jessup*, the court can be expected to draw upon both the evidence and its knowledge of the drug trade, with the help of experts as necessary, in reaching its determination. It is unlikely that trial judges would be hoodwinked often on this issue. The defendant should then be properly sentenced both for the act done and for the act the defendant believed he was doing. In most cases, as for example, importation of drugs from Nigeria, there would be a congruence between act and mental state. Of course, variants of the presumption approach can be crafted, shifting burdens of persuasion as well as raising their levels in furtherance of policy. *See* John H. Mansfield, Norman Abrams & Margaret A. Berger, *Cases and Materials on Evidence* 1101–78 (8th ed. 1988).

### 3. Justifications

Numerous justifications support the adoption of this burden-of-proof structure for mistakes of fact at the sentencing phase of narcotics cases.

First is the history and traditional application of the *mens rea* principle. Such a fundamental aspect of a constitutional democracy founded upon individual free will is not to be lightly cast aside. The Framers of our Constitution and first amendments, Congress and the Sentencing Commission must all be assumed to have acted with this principle in mind. *See* Joel Prentiss Bishop, *Bishop on Criminal Law* § 291b (9th ed. 1923) ("A statute is simply a fresh particle of legal matter dropped into the previously existing ocean of law. It is subject to all the old attractions, and the old winds and lunar influences, precisely as were the several particles of the ocean before."); Glanville Williams, *Criminal Law: The General Part* 260 (2d ed. 1961) ("[T]he law of *mens rea* belongs to the general part of the criminal law, and it is not reasonable to expect Parliament every time it creates a new crime to enact it or even to make reference to it."). Intent to dispense with it must be shown far more clearly than it has been in this instance.

▋ Second is the Constitution. An analysis of the relevant materials reveals that the *mens rea* principle enjoys constitutional stature. Where possible, constitutional defects are to be avoided in the interpretation of statutes. Congress is assumed to have acted consistently with the Constitution. If an approach is available, as here, that obviates the need for direct interpretation and application of the due process clause, it should be utilized.

Third is the rule of lenity. Neither Congress nor the Sentencing Commission has clearly expressed its intent that a defendant's plain mistake of fact as to drug type should be ignored when it comes to sentencing. Consistent with longstanding prudential practice, it should be assumed that the less harsh result was intended by the legislature and its administrative delegate.

Fourth is traditional principles of sentencing. Individual treatment when it comes to punishment is nearly as fundamental to our system of criminal law as the *mens rea* principle itself. The two work hand-in-hand. A defendant's mental state becomes highly relevant at sentencing. Along with the traditional importance of blameworthiness at sentencing comes the traditional division of the criminal process between conviction and sentencing phases. Care must be taken by courts in applying the Guidelines not to cause erosion of this distinction. Congress created

the Sentencing Commission in large part to avoid "unwarranted sentencing disparities." 28 U.S.C. § 991(b)(1)(B). Congress could not have intended to empower a general "Criminal Law Commission" with the authority to create a *sub rosa* criminal code applicable at the sentencing phase and providing prosecutors with a means of avoiding the burdens of the conviction stage.

Fifth is considerations of deterrence. Congress' intent to deter narcotics importation should be assumed to have been implemented rationally. The history of the drug importation laws indicates a steady progression in the direction of finer culpability distinctions. The argument that once a person crosses the threshold into the federal narcotics laws, the *mens rea* principle falls away and, thereafter, only acts count flies in the face of the complex penalty hierarchy created by the relevant statutes and Guidelines. It is not prudent to construct an elaborate ladder of punishment and then automatically bump defendants up that ladder without regard to their mental states. As the drafters of the Model Penal Code and other esteemed commentators have explained, mistakes of fact are equally relevant in applying the criminal law to the guilty as to the innocent. Ignoring the defendant's mental state at the punishment phase serves only retributive purposes. Even then, it is hard to see the point in slapping a child who does not understand the wrong done. Such a blow can only confound its recipient.

Sixth is the seriousness of the offense at issue here and the severity of the punishment it carries. Drawing the line between those crimes traditionally considered public-welfare offenses and those strict liability offenses generally deemed not acceptable is difficult. A type of sliding-scale analysis is probably appropriate. Those offenses carrying lengthy terms of imprisonment and involving criminal conduct widely and seriously condemned by society would fall at one end of this scale. Transgressions punished by fines or misdemeanor terms of imprisonment ("violations," in the parlance of the Model Penal Code) and involving regulatory types of protection of public health and safety would fall at the other end. Precise calibration of that scale is not necessary in the instant cases. These are serious drug offenses carrying potential mandatory minimum sentences of five years or more and maximum sentences of up to life. Congress has by now made clear its intention that narcotics offenses be treated as among the most grave in the federal criminal laws. The statutes at issue here do not come near to the kinds of regulatory health and safety laws, carrying light penalties, that have traditionally been considered public-welfare offenses.

Seventh, and finally, is the requirement that courts balance the needs of law enforcement with basic fairness to defendants. The argument that deterrence objectives are advanced to some degree even when the *mens rea* principle is abandoned—because the risk of taking care to conform to the law is cast upon the defendant—does have some validity. It is also true that the government's burden of proving the requisite mental state can sometimes be a difficult one that may need to be excused in certain instances. But these principles should not be carried to unnecessary extremes.

Suppose, for example, that a potential drug importer is recruited for a trip to the United States. Assume, as theory requires us to, that the putative importer has full knowledge of our narcotics laws, including the elaborate penalty ladder constructed by the applicable statutes and Guidelines. He or she knows heroin is punished more severely per gram than cocaine and inquires about the nature of the white substance contained in the packets he or she is asked to swallow. The importer expects it to be cocaine and is told by the drug hierarchy that the packages contain cocaine after making clear that he or she wants no involvement with heroin. After arrest in the United States, laboratory analysis reveals the powdered substance to be heroin.

Such a "reasonably prudent" defendant can be posited with respect to many crimes. It may be fair to presume full knowledge of the law and it may also be fair to thrust upon the defendant the risk of being subject to enhanced penalties due to certain characteristics of the criminal activity involved. But

such standards of care must be fairly enforced by permitting the defendant to raise the issue that he or she lived up to the applicable standard of care.

All of these justifications suggest that a presumption mechanism is an acceptable way to harmonize *mens rea* and other fundamental principles with the practical requirements of the law. It is consistent with the trend in the criminal law of increasing specificity and careful delineation of exceptions in handling matters of *mens rea*. It is a modest approach which rejects the notion that first principles of law have been, or constitutionally can be, cast aside when the pressing needs of a war on drugs and other transient "emergencies" of the day are invoked.

## III. APPLICATION OF LAW TO FACTS

Both Cordoba–Hincapie and Buelvas–Castro proved, beyond a reasonable doubt, at sentencing that they believed they were importing cocaine. Their proof met both a subjective test of knowledge and an objective test of reasonableness. Whatever the burden of proof or the nature of the presumption, defendants have established beyond a reasonable doubt lack of *mens rea* respecting heroin. Not only their credible testimony but all of the facts establishing the context of their particular acts of importation supported that finding. Neither defendant acted deliberately, recklessly or negligently or wilfully closed his or her eyes, in arriving at the belief that the balloons they carried contained cocaine rather than heroin.

In Cordoba–Hincapie's case, the base offense level was initially calculated at 30, based upon between 700 grams and one kilogram of heroin. Had the facts been as she believed them to be, the base offense level would have been calculated at 26, based upon between 500 grams and two kilograms of cocaine. She should be sentenced pursuant to a base offense level of 26. Her Guidelines range, after conceded adjustments for acceptance of responsibility and minimal role, is 30 to 37 months imprisonment.

Alternatively, if the court of appeals should find that Cordoba–Hincapie's proper base offense level is 30, a downward discretionary departure of four levels, to a level 26, is called for in view of her medical condition, her dependent children and her weak emotional state which will subject her to potential abuse in prison. Each of these factors, alone or in combination, supports such a downward departure.

In Buelvas–Castro's case, the base offense level was initially calculated at 28, based upon between 400 and 700 grams of heroin. Had the facts been as he believed them to be, the base offense level would have been 26, based upon between 500 grams and two kilograms of cocaine. He should be sentenced pursuant to a base offense level of 26. With conceded adjustments for minimal role and acceptance of responsibility, his Guidelines range is also 30 to 37 months imprisonment.

## IV. CONCLUSION

Cordoba–Hincapie is sentenced to 30 months in prison, five years supervised release and a $50 assessment. Buelvas–Castro is sentenced to 30 months in prison, three years supervised release and a $50 assessment. Neither has assets so a fine is inappropriate.

SO ORDERED.